IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 24-2733

UNITED STATES OF AMERICA,
Appellee

v.

JOHN DOUGHERTY,
Appellant

On Appeal from the United States District Court for the
Eastern District of Pennsylvania, Crim. No. 19-0064-01
(Hon. Jeffrey L. Schmehl, U.S. District Judge)

BRIEF FOR APPELLANT

K. ANTHONY THOMAS,
Federal Public Defender

Timothy M. Shepherd
Anita Aboagye-Agyeman
Assistant Federal Public Defenders
22 South Clinton Avenue
Station Plaza #4, Fourth Floor
Trenton, New Jersey 08609
(609) 690-0414

Attorneys for Appellant
John Dougherty

# Table of Contents

Table of Authorities ......................................................................................... v

Statement of Subject Matter and Appellate Jurisdiction ........................ 1

Statement of Related Cases .................................................................... 2

Statement of the Issues ......................................................................... 4

Introduction ........................................................................................... 6

Statement of the Case ........................................................................... 10

    A. Factual background and the alleged crimes .............................. 10

        1. Honest services fraud ....................................................... 12

        2. Embezzlement .................................................................. 18

    B. Procedural history. ..................................................................... 21

        1. Honest services fraud case. ............................................. 22

        2. Motion to dismiss based on conflicted counsel .............. 25

        3. Motion to dismiss based on government's use of confidential informant. ....................................................................... 27

        4. Embezzlement case. ......................................................... 30

        5. Sentencing ....................................................................... 33

Summary of the Arguments ................................................................. 35

Argument .............................................................................................. 39

I. The district court should have granted Dougherty's motion to dismiss Counts 97-109 because his charged conduct did not constitute honest services fraud. ................................................... 39

A.  Honest services fraud prosecutions are limited to the core of bribery and kickbacks to avoid federal overreach into local public corruption concerns. .......................................................... 40

B.  The government did not allege that Dougherty had a specific corrupt intent in connection with any agreement or *quid*. ......... 42

1.  The government's bribery theory failed because it did not argue that Dougherty had corrupt intent at the beginning of the stream-of-benefits arrangement. ....................................... 42

2.  The government failed to allege that Dougherty intended to influence a specific "question or matter" at the time of the *quid pro quo*, as required in *Silver*. ........................................... 48

C.  The honest services fraud statute is unconstitutionally vague as applied to Dougherty. ............................................................ 53

II. The district court should have granted Dougherty's Rule 29 motions because the government did not put on sufficient evidence of honest services fraud. ................................................... 59

A.  The government's prosecution was clearly about a conflict of interest, not bribery. .................................................................... 60

B.  Dougherty did not authorize Henon's ongoing employment at Local 98. ................................................................................ 64

C.  The evidence did not show that Dougherty entered into a corrupt agreement with Henon at the beginning of the purported stream of benefits. .................................................... 68

D.  The government did not prove that Dougherty possessed the intent to influence a properly defined question or matter, as required by *McDonnell*. ................................................................. 75

E.  None of Henon's identified conduct constituted "official action." ................................................................................... 78

1.  L&I / CHOP .......................................................................... 80

ii

2. Plumbing Code ................................................................ 82

3. Comcast Franchise Agreement ................................................. 85

4. Soda Tax .................................................................... 87

5. Towing ..................................................................... 90

III. The district court's jury instructions for the honest services fraud trial included several misstatements of law that merit vacating Dougherty's convictions. ................................................. 91

A. The district court erroneously denied Dougherty's requested *quid pro quo* instruction to comply with *McDonnell* and *Silver*. 92

B. The district court erred by giving a non-Model mixed motive instruction that misstated the law for honest services fraud. .... 95

C. The district court's "official act" instruction relieved the government of its burden to prove an element. ........................ 99

IV. The district court should have granted Dougherty's motion to dismiss based on his counsel's conflict of interest in the honest services fraud case. ................................................... 105

A. Defendants have a constitutional right to conflict-free counsel. ..................................................................... 106

B. The Firm's representation of Comcast was a conflict that violated Dougherty's Sixth Amendment rights. ....................... 107

1. Attorney 1 and his Firm had an actual conflict in this case. . 107

2. The conflict adversely affected Attorney 1's performance. ..... 112

V. The district court should have granted Dougherty's motion to dismiss under the Sixth Amendment based on the government's improper use of a confidential informant. ....................................... 117

A. The Sixth Amendment protects against secret interrogations and other efforts to circumvent a defendant's right to counsel. 117

B. The government's reliance on a CI to monitor Dougherty throughout his underlying case violated his Sixth Amendment rights............................................................................... 119

C. The government's use of a filter team did not cure its Sixth Amendment violations. ........................................................... 124

VI. The district court's embezzlement jury instructions misstated the law and understated the requisite *mens rea*.................................... 130

A. Conviction for embezzlement from a labor organization requires proof that the defendant acted "knowingly, willfully, unlawfully, and with fraudulent intent."................................... 130

B. The district court's "willful blindness" instruction for embezzlement was erroneous.................................................... 132

C. The district court's modifications to the Model Instruction on the "good faith" defense misstated the law............................... 136

Conclusion ................................................................................... 142

Certificate of Counsel, Compliance, and Service.................................. 143

# Table of Authorities

## Cases

*BE & K Constr. Co. v. NLRB*, 536 U.S. 516 (2002) ................................ 82

*Bennis v. Gable*, 823 F.2d 723 (3d Cir. 1987) ....................................... 105

*Boykin v. Webb*, 541 F.3d 638 (6th Cir. 2008) ...................................... 115

*Cheek v. United States*, 498 U.S. 192 (1991)........................................ 139

*Ciminelli v. United States*, 598 U.S. 306 (2023) .................................... 41

*Cleveland v. United States*, 531 U.S. 12 (2000) ............................... 40, 59

*Cuyler v. Sullivan*, 446 U.S. 335 (1980).................................... 106, 116

*Evans v. United States*, 504 U.S. 255 (1992) ..................................... 46, 73

*Gov't of V.I. v. Zepp*, 748 F.2d 125 (3d Cir. 1984) ........................ 107, 110

*Grayned v. City of Rockford*, 408 U.S. 104 (1972) ................................ 53

*Holder v. Humanitarian L. Project*, 561 U.S. 1 (2010) .......................... 53

*Iannelli v. United States*, 420 U.S. 770 (1975) ...................................... 73

*In re Fattah*, 802 F.3d 516 (3d Cir. 2015) .................................... 125, 129

*In re Grand Jury Subpoenas*, 454 F.3d 511 (6th Cir. 2006)................. 126

*Johnson v. United States*, 576 U.S. 591 (2015)...................................... 53

*Kelly v. United States*, 590 U.S. 391 (2020) .......................................... 41

*Kolender v. Lawson*, 461 U.S. 352 (1983) .............................................. 57

*Lady J. Lingerie, Inc. v. City of Jacksonville*,
176 F.3d 1358 (11th Cir. 1999) ......................................................... 65

*Maine v. Moulton*, 474 U.S. 159 (1985)............................................... 118

*Massiah v. United States*, 377 U.S. 201 (1964) ................................... 118

*Matter of the Search of the Scranton Hous. Auth.*,
436 F. Supp. 2d 714 (M.D. Pa. 2006) ............................................... 126

*McCormick v. United States*, 500 U.S. 257 (1991)................................ 82

*McDonnell v. United States*, 579 U.S. 550 (2016)..........................*passim*

*McNally v. United States*, 483 U.S. 350 (1987) .................... 40, 54, 57, 58

*Mirabella v. Villard*, 853 F.3d 641 (3d Cir. 2017) ..................................82

*Percoco v. United States,* 598 U.S. 319 (2023) ............................ 6, 54, 58

*Powell v. Alabama*, 287 U.S. 45 (1932)...............................................118

*San Filippo v. Bongiovanni*, 961 F.2d 1125 (3d Cir. 1992) ....................53

*Skilling v. United States*, 561 U.S. 358 (2010) ..............................*passim*

*Smith v. Horn*, 120 F.3d 400 (3d Cir. 1997)......................... 105, 136, 141

*Snyder v. United States*, 603 U.S. 1 (2024)................................ 40, 45, 59

*State v. Robinson*, 209 A.3d 25 (Del. 2019)..........................................125

*Sullivan v. Louisiana*, 508 U.S. 275 (1993) .........................................104

*United States v. Allinson*, 27 F.4th 913 (3d Cir. 2022)..........................78

*United States v. Alston-Graves*, 435 F.3d 331 (D.C. Cir. 2006).... 133, 134

*United States v. Aunspaugh*, 792 F.3d 1302 (11th Cir. 2015)...............98

*United States v. Bellille*, 962 F.3d 731 (3d Cir. 2020) .........................111

*United States v. Bentz*, 21 F.3d 37 (3d Cir. 1994)..................................68

*United States v. Brink*, 39 F.3d 419 (3d Cir. 1994) .............................105

*United States v. Brodie*, 403 F.3d 123 (3d Cir. 2005) .........................133

*United States v. Bryant*, 556 F. Supp. 2d 378 (D.N.J. 2008).................89

*United States v. Bryant*, 655 F.3d 232 (3d Cir. 2011).....................*passim*

*United States v. Bunchuk*,
    799 F. App'x 100 (3d Cir. 2019) (unpublished).................................139

*United States v. Burnette*, 65 F.4th 591 (11th Cir. 2023)................ 45, 50

*United States v. Caraballo-Rodriguez*, 726 F.3d 418 (3d Cir. 2013)....133

*United States v. Cassiere*, 4 F.3d 1006 (1st Cir. 1993) ........................133

*United States v. Ciavarella*, 716 F.3d 705 (3d Cir. 2013)......................41

*United States v. Clark,*
489 F. App'x 558 (3d Cir. 2012) (unpublished) .................................131

*United States v. Conley,* 37 F.3d 970 (3d Cir. 1993) ..............................71

*United States v. Costanza,* 625 F.2d 465 (3d Cir. 1980) ......................119

*United States v. Costanza,* 740 F.2d 251 (3d Cir. 1984) ....... 119, 120, 124

*United States v. Cottrell,* 1986 WL 11439 (E.D. Pa. Oct. 9, 1986) .......139

*United States v. Cryan,* 490 F. Supp. 1234 (D.N.J. 1980) ......................65

*United States v. Danielson,* 325 F.3d 1054 (9th Cir. 2003) ..................123

*United States v. Davis,*
841 F. App'x 375 (3d Cir. 2021) (unpublished) ...................................48

*United States v. DeFries,* 129 F.3d 1293 (D.C. Cir. 1997) ...................140

*United States v. Dressel,*
625 F. App'x 583 (3d Cir. 2015) (unpublished) .................................140

*United States v. Fattah,* 914 F.3d 112 (3d Cir. 2019) .................... *passim*

*United States v. Gambino,*
864 F.2d 1064 (3d Cir. 1988) ..................................... 106, 107, 109, 112

*United States v. Ganim,* 510 F.3d 134 (2d Cir. 2007) ...........................46

*United States v. Greenspan,* 923 F.3d 138 (3d Cir. 2019) .....................97

*United States v. Gross,* 961 F.2d 1097 (3d Cir. 1992) .........................138

*United States v. Haywood,* 363 F.3d 200 (3d Cir. 2004) ......................105

*United States v. Henry,* 447 U.S. 264 (1980) .......................................120

*United States v. Heredia,* 483 F.3d 913 (9th Cir. 2007) (en banc) .......134

*United States v. Hills,* 27 F.4th 1155 (6th Cir. 2022) ..................... 49, 77

*United States v. Hoffecker,* 530 F.3d 137 (3d Cir. 2008) ........................97

*United States v. Hoffert,* 949 F.3d 782 (3d Cir. 2020) .......... 59, 68, 75, 78

*United States v. Hohn,* 123 F.4th 1084 (10th Cir. 2024) .....................128

*United States v. Householder,* 137 F.4th 454 (6th Cir. 2025) ...............46

*United States v. Islam*, 102 F.4th 143 (3d Cir. 2024) ............................39

*United States v. Kemp*, 500 F.3d 257 (3d Cir. 2007)......................*passim*

*United States v. Lee*, 966 F.3d 310 (5th Cir. 2020) ..............................134

*United States v. Levy*, 577 F.2d 200 (3d Cir. 1978) ...................... 123, 124

*United States v. Lindberg*, 39 F.4th 151 (4th Cir. 2022) ...... 100, 102, 104

*United States v. Lopez-Cotto*, 884 F.3d 1 (1st Cir. 2018).......................45

*United States v. Lore*, 430 F.3d 190 (3d Cir. 2005)...................... 131, 140

*United States v. Lynch*, 807 F. Supp. 2d 224 (E.D. Pa. 2011) .......... 46, 47

*United States v. MacInnes*, 23 F. Supp. 3d 536 (E.D. Pa. 2014) ............97

*United States v. Madigan*, ___ F.4th ___,
 2026 WL 1133645 (7th Cir. Apr. 27, 2026).............................. 50, 77, 94

*United States v. Maloney*, 513 F.3d 350 (3d Cir. 2008) .........................53

*United States v. Mapelli*, 971 F.2d 284 (9th Cir. 1992).......................133

*United States v. Marino*, 562 F.2d 941 (5th Cir. 1977) .........................71

*United States v. Mastroianni*, 749 F.2d 900 (1st Cir. 1984).................124

*United States v. McCabe*, 103 F.4th 259 (4th Cir. 2024).......................85

*United States v. Menendez*,
 291 F. Supp. 3d 606 (D.N.J. 2018) ......................................... 45, 48, 89

*United States v. Morelli*, 169 F.3d 798 (3d Cir. 1999) .......... 105, 107, 109

*United States v. Moscony*, 927 F.2d 742 (3d Cir. 1991) ................. 109, 110

*United States v. Neill*, 952 F. Supp. 834 (D.D.C. 1997)................. 126, 127

*United States v. O'Donnell*, 510 F.2d 1190 (6th Cir. 1975) ...................65

*United States v. Oliva*, 46 F.3d 320 (3d Cir. 1995)........................*passim*

*United States v. Ozcelik*, 527 F.3d 88 (3d Cir. 2008) .............................89

*United States v. Panarella*,
 2011 WL 3273599 (E.D. Pa. Aug. 1, 2011).........................................61

*United States v. Panarella*, 277 F.3d 678 (3d Cir. 2002)...... 41, 61, 62, 98

*United States v. Peterson*, 622 F.3d 196 (3d Cir. 2010) ........................104

*United States v. Porat*, 76 F.4th 213 (3d Cir. 2023) .................................8

*United States v. Reichberg*, 5 F.4th 233 (2d Cir. 2021) ....................67, 83

*United States v. Repak*, 852 F.3d 230 (3d Cir. 2017)........................48, 79

*United States v. Schneider*, 14 F.3d 876 (3d Cir. 1994).......................131

*United States v. Schwarz*, 283 F.3d 76 (2d Cir. 2002).................. 114, 116

*United States v. Sherman*, 126 F.4th 224 (3d Cir. 2025) ....................133

*United States v. Silver*, 948 F.3d 538 (2d Cir. 2020) ...................... *passim*

*United States v. Skelos*, 988 F.3d 645 (2d Cir. 2021)............................94

*United States v. Steiner*, 847 F.3d 103 (3d Cir. 2017) .....................91, 130

*United States v. Stewart*, 185 F.3d 112 (3d Cir. 1999) ......... 110, 133, 134

*United States v. Stockton*, 788 F.2d 210 (4th Cir. 1986) ......................131

*United States v. Thayer*, 201 F.3d 214 (3d Cir. 1999) ...........................59

*United States v. Traitz*,
    2002 WL 31681967 (E.D. Pa. Nov. 26, 2002)......................................71

*United States v. Tyler*, 164 F.3d 150 (3d Cir. 1998) ............................117

*United States v. Tyson*, 653 F.3d 192 (3d Cir. 2011) .............................65

*United States v. Urciuoli*, 513 F.3d 290 (1st Cir. 2008) ...................82, 91

*United States v. Urciuoli*, 613 F.3d 11 (1st Cir. 2010) ..........................70

*United States v. Varelli*, 407 F.2d 735 (7th Cir. 1969) ..........................46

*United States v. Voigt*, 89 F.3d 1050 (3d Cir. 1996) ............................117

*United States v. Washington*, 79 F.4th 320 (3d Cir. 2023).........64, 75, 77

*United States v. Wiltshire*,
    568 F. App'x 135 (3d Cir. 2014) (unpublished)..........................104, 141

*United States v. Wright*, 665 F.3d 560 (3d Cir. 2012)................... *passim*

*United States v. Yeaman*, 194 F.3d 442 (3d Cir. 1999).........................91

*United States v. Zavrel*, 384 F.3d 130 (3d Cir. 2004) .......................59, 64

*United States v. Zehrbach,*
   47 F.3d 1252 (3d Cir. 1995) (en banc) ....................... 105, 136, 139, 141

*Weatherford v. Bursey*, 429 U.S. 545 (1977) ......................................... 119

*Wood v. Georgia*, 450 U.S. 261 (1981) ................................................. 106

## Statutes

18 U.S.C. § 371 ..................................................................... 11, 12, 130

18 U.S.C. § 664 ........................................................................... 11

18 U.S.C. § 1341 .......................................................................... 12

18 U.S.C. § 1343 .................................................................. 11, 12, 68

18 U.S.C. § 1346 ................................................................... *passim*

18 U.S.C. § 3231 ........................................................................... 1

18 U.S.C. § 3742(a) ....................................................................... 1

26 U.S.C. § 7206 .......................................................................... 11

28 U.S.C. § 1291 ........................................................................... 1

29 U.S.C. § 431 ........................................................................... 11

29 U.S.C. § 436 ........................................................................... 11

29 U.S.C. § 439 ........................................................................... 11

29 U.S.C. § 501(c) ................................................................. *passim*

## Rules

Fed. R. Crim. P. 29 ................................................................ *passim*

Fed. R. Crim. P. 33 ...................................................................... 25

## Constitutional Provisions

U.S. Const. amend. V ......................................................... 4, 26, 27, 30

U.S. Const. amend. VI ............................................................. *passim*

## Other Authorities

Albert W. Alschuler, *Criminal Corruption: Why Broad Definitions of Bribery Make Things Worse*, 84 Fordham L. Rev. 463 (2015)........ 8, 47

Bridget Vuona, *Remember Me, "Part C"?: Honest Services Fraud Schemes Involving Bribery Under "Part C"" of the Federal Bribery Statute Post-McDonnell*, 55 Am. Crim. L. Rev. Online 35 (2018) ....... 48

Mod. Crim. Jury Instr. 3rd Cir. 5.06 (2024) ........................................ 135

Mod. Crim. Jury Instr. 3rd Cir. 5.06, Comment (2024) ...................... 134

Mod. Crim. Jury Instr. 3rd Cir. 5.07 (2024) ................................ 137, 138

Mod. Crim. Jury Instr. 3rd Cir. 5.07, Comment (2024) ...................... 138

Mod. Crim. Jury Instr. 3rd Cir. 6.18.201B1-2 (2024).................. 100, 103

Oona Goodin-Smith and Jeremy Roebuck, *A Juror in the Dougherty-Henon trial says it was a lesson in Philly government—'and it was appalling,'* Philadelphia Inquirer (Nov. 16, 2021).............................. 63

## Statement of Subject Matter and Appellate Jurisdiction

This is a direct appeal of Appellant John Dougherty's conviction and sentence. The district court had subject matter jurisdiction pursuant to 18 U.S.C. § 3231. This Court has jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a). The district court sentenced Dougherty on July 11, 2024, entered a judgment on July 15, 2024, and entered an amended judgment on September 11, 2024. Appx3-20; DE 778, 812.[1] Dougherty timely filed his Notice of Appeal on September 16, 2024. Appx1; DE 816.

---

[1] "Appx" refers to the Appellant's Appendix filed with this brief. "S.Appx" refers to Appellant's Sealed Special Appendix. In addition, pursuant to Third Circuit Local Appellate Rule 30.3(c), four copies of the Presentence Investigation Report (PSR)—including a draft PSR and addenda—and four copies of the District Court's Statement of Reasons (SOR) are separately filed under seal with this brief. "DE" refers to docket entries from the Eastern District of Pennsylvania, criminal case number 19-0064-01 (JLS).

John Dougherty was indicted along with seven co-defendants in the underlying criminal case. Two of Dougherty's co-defendants in that case appealed to this Court after their convictions. *See United States v. Robert Henon*, No. 23-1463 (3d Cir.); *United States v. Brian Burrows*, No. 24-2766 (3d Cir.). Robert Henon's conviction was affirmed in 2024. This Court held oral argument on Brian Burrows's appeal in October 2025 and has not yet issued an opinion.

Dougherty also recently moved for compassionate release in the underlying case, based on the need to care for his wife, who suffers from serious health issues. *See United States v. Dougherty*, No. 2:19-cr-0064, ECF No. 852 (E.D. Pa. Aug. 28, 2025). The district court initially denied the motion but, after Dougherty moved to reconsider, it scheduled a hearing for May 18, 2026. The motion remains pending.

Dougherty was also separately charged with extortion and related offenses in 2021 by the same U.S. Attorney's Office. *See United States v. Dougherty*, No. 2:21-cr-0065 (E.D. Pa.). That case resulted in a hung jury, mistrial, and the dismissal of charges against Dougherty. Dougherty's co-defendant, Gregory Fiocca, pled guilty, was sentenced to probation, and

did not appeal.

Dougherty is not aware of any other related proceeding before this Court or any other court or agency, local, state, or federal.

# Statement of the Issues

I.      Whether charges against Dougherty in the Indictment constituted honest services fraud.

<u>Preservation</u>: Dougherty preserved this issue and underlying arguments by filing a motion to dismiss. Appx384-416.

II.      Whether the government adduced sufficient evidence at trial to convict Dougherty of the honest services fraud charges.

<u>Preservation</u>: Dougherty preserved this issue and underlying arguments by filing Rule 29 motions for judgment of acquittal. Appx3452-92, 3505-3649, 4703-39.

III.      Whether the district court properly instructed the jury on the law with respect to honest services fraud.

<u>Preservation</u>: Dougherty preserved this issue and underlying arguments by proposing certain jury instructions and objecting to the government's proposed instructions. Appx609-57, 4187-88, 4191-4224, 4228-35, 4459-75.

IV.      Whether Dougherty's counsel during his honest services fraud trial was conflicted, meriting vacatur of his conviction.

<u>Preservation</u>: Dougherty preserved this issue by moving to dismiss and to vacate his conviction on this ground. S.Appx110-30, 242-59, 9026-44.

V.      Whether the government's use of a confidential informant after Dougherty's indictment violated his Fifth and Sixth Amendment rights.

<u>Preservation</u>: Dougherty preserved this issue by moving to dismiss on this ground. S.Appx60-109.

VI.   Whether the district court properly instructed the jury on the law with respect to embezzlement.

Preservation: Dougherty preserved this issue by proposing certain jury instructions and objecting to the government's proposed instructions. Appx8276-8378, 8387-8402.

## Introduction

*"To this day, no one knows what 'honest-services fraud' encompasses."*

*Percoco v. United States,* 598 U.S. 319, 333 (2023) (Gorsuch, J., concurring).

John Dougherty spent most of his adult life working tirelessly to grow and advance the interests of Local Union 98 of the International Brotherhood of Electrical Workers ("Local 98") in Philadelphia. Now, after nearly 30 years as the business manager of the union, he is serving a six-year prison sentence for purportedly bribing a fellow Local 98 employee on Philadelphia's City Council to further labor interests, and using union funds for personal expenses.

Dougherty's conviction stems from an overzealous federal prosecution of a novel theory of honest services fraud. According to the government, when Local 98 political director, Bobby Henon, was elected to the City Council, his continued receipt of a partial salary from the union constituted an honest services fraud by him and Dougherty. The arrangement appeared to present, at worst, a conflict of interest, but the Supreme Court has rejected conflict-of-interest prosecutions under the honest services fraud statute. So, the government attempted to fit this

case into an unorthodox bribery theory—that Henon's lawful outside salary was not just a conflict of interest, but at some unidentified time became a stream-of-benefits bribe by Dougherty in exchange for ongoing access and influence over later-identified official actions by Henon.

The district court acknowledged there had never been a case like this, even as it denied Dougherty's motions highlighting the misuse of the honest services fraud statute. The court raised serious concerns that the government's theory could turn an untold number of local politicians into criminals merely for maintaining lawful outside employment and responding to constituent inquiries. The conduct in this case was ordinary and lawful local politics; and it was ordinary and lawful action by organized labor, regardless of the government's objections. Henon was allowed, under local law, to keep outside employment. And he was required as a city councilmember to remain responsive to constituents, including those with shared interests in organized labor. Dougherty exercised what political capital he had, with Henon and other politicians, to advance those labor interests, just as he was dutybound to do as a prominent labor leader.

This case is part of a long history of misuse of the fraud statutes to target perceived state and local political corruption. The Supreme Court has repeatedly rebuked the government for such efforts. As one judge on this Court recently explained: the

> Supreme Court and appellate courts have repeatedly emphasized that due process and federalism principles require the government to proceed with caution when bringing fraud prosecutions. And yet, there is a continued need for vigilance, lest prosecutors convert the fraud statutes—and the lengthy prison sentences that they can trigger—into tools to regulate good morals and business ethics.

*United States v. Porat*, 76 F.4th 213, 223-24 (3d Cir. 2023) (Krause, J., concurring). "Broad definitions of bribery not only sweep into their net common and widely accepted behavior, they also invite unjustified inferences and empower prosecutors to pick their targets." Prof. Albert W. Alschuler, *Criminal Corruption: Why Broad Definitions of Bribery Make Things Worse*, 84 Fordham L. Rev. 463, 481 (2015) ("Alschuler").

The government's outsize eagerness to prosecute Dougherty in this case extended beyond the misuse of honest services fraud. The government: wiretapped Dougherty and Henon for years; brought other questionable criminal charges; authorized an informant to illegally record Dougherty even after his right to counsel had attached; looked the

8

other way on Dougherty's counsel's clear conflict of interest; and advanced erroneous legal theories that tainted the jury instructions of both of Dougherty's underlying trials.

Dougherty's conviction exemplifies the precise risks that the Supreme Court has warned about for decades—the federal government overreaching to enforce its preferred practices in state and local policymaking, in ways that are all but certain to chill normal fundraising, lobbying, and constituent services. This Court should intervene, correct those errors, and vacate Dougherty's convictions.

**Statement of the Case**

**A. Factual background and the alleged crimes**

From 1993 to 2021, John Dougherty served as the business manager of a prominent labor union in Philadelphia, Local Union 98 of the International Brotherhood of Electrical Workers ("Local 98"). He oversaw a period of extraordinary growth for the union, during which time membership increased from roughly 1,900 to 4,600, and effective wages increased from roughly $37 per hour to $105 per hour. Appx4334-35. Dougherty was "one of the most well-connected and influential people in Philadelphia," and was "the primary reason why Local 98 is an economic, political, and social powerhouse in Philadelphia and throughout the Commonwealth of Pennsylvania." Appx70.

His friend and fellow union member, Robert Henon, joined Local 98 in 1989 and was named political director in 2003. Appx4338. Henon successfully ran for Philadelphia City Council in 2011. Appx70. He began serving in 2012 and remained an employee of Local 98 during his tenure, albeit at a reduced salary. Councilmembers are legally permitted to maintain outside employment, and Henon reported his ongoing employment with Local 98. Appx70, 4338-39.

In January 2019, the government obtained an Indictment alleging

116 criminal counts against Dougherty, Henon, and six others. Appx224-383. As relevant to this appeal, the government charged two basic sets of offenses.

First, it alleged that from April 2010 to August 2016, Dougherty conspired with others at Local 98 to embezzle funds from the union, in violation of 18 U.S.C. §§ 371 and 664, and 29 U.S.C. § 501(c). Appx230-307. The Indictment charged that Dougherty: used Local 98 credit cards for personal purchases like groceries and meals, used funds from Local 98's apprentice training program to pay for work to be done on his home and other properties, and directed the union to hire his friends and family members, resulting in their payment for hours spent doing personal tasks for Dougherty or hours never worked. Appx230-32. Relatedly, the Indictment alleged that Dougherty committed wire fraud thefts from Local 98 and a Political Action Committee, in violation of 18 U.S.C. § 1343, falsified labor union financial reports and records, in violation of 29 U.S.C. §§ 431, 436, and 439, and filed false tax returns that failed to include information described above, in violation of 26 U.S.C. § 7206. Appx304-21.

Second, the Indictment alleged that, from May 2015 to September

2016, Henon's ongoing employment by Local 98 constituted a bribe by Dougherty, amounting to a conspiracy to commit honest services fraud, in violation of 18 U.S.C. §§ 371, 1341, 1343, 1346. Appx337-62. According to the government, Local 98 provided Henon with a stream of personal benefits—primarily his salary—with the intent to influence his decision-making as councilmember. Appx357. It alleged several purported official acts taken by Henon at Dougherty's behest. Appx341-55.[2]

### 1. Honest services fraud

The government alleged that, while Henon was a city councilmember in 2015 and 2016, he received a stream of benefits from Local 98—his ongoing salary, employment benefits, and tickets to sporting and other events—which acted as an ongoing bribe for Henon to perform actions Dougherty wanted as the need arose. Appx4240-41, 4259-60.[3]

In November 2011, Henon was elected to represent District 6 on the

---

[2] This brief does not address counts alleging a labor bribery scheme, which were dismissed, *see* Appx8471, or counts in which Dougherty was not charged.

[3] For clarity and brevity, these details are summarized primarily from the Indictment and the parties' summaries of arguments and evidence in opening statements and closing arguments.

Philadelphia City Council, a job he began in January 2012, and to which he was reelected in 2015. Appx952-56. The government's case was limited to May 2015 to September 2016, during which time it wiretapped phones belonging to Dougherty, Henon, and others. Appx812-13, 893-904. In those years Henon was paid $129,373 and $138,890 respectively for his position as a city councilmember. Appx971-71. The city of Philadelphia allows councilmembers to maintain outside employment, Appx62 n.3, 4244, and Henon continued his employment with Local 98 during that time, which he reported to the city and state. Appx972-81. Local 98 paid him $70,649 in 2015 and $73,131 in 2016, Appx966, 969, which reflected a significant reduction from the salary he received before his election to City Council, Appx2108.

The government asserted that Henon's ongoing employment and salary from Local 98 was at Dougherty's direction, based on his authority to hire and fire Henon, and comments Dougherty made. Appx4243, 4315-19. Henon also received tickets from Local 98 to sporting and other events during this time, including to a Philadelphia Eagles game he and several other city councilmembers attended soon after the approval of the Comcast franchise agreement, discussed below. Appx340, 344, 4243-44.

The government argued that those benefits were given by Dougherty to induce the following actions by Henon, which it alleged were official acts.

***Plumbing Code.*** In August and September 2015, Henon allegedly planned to introduce and then hold up legislation to update the city's plumbing code. Appx815-18, 1165-72, 4256, 4274-78. At the time, Dougherty was running for business manager of the Philadelphia Building and Construction Trades Council ("Building Trades"), an umbrella organization of more than 50 local member unions from the construction industry. Appx815-16, 4274, 4333-34. The government alleged that Dougherty wanted Henon to use the plumbing code as leverage against the plumbers' union, who opposed the code, because they did not support Dougherty's candidacy to head the Building Trades. Appx815-18, 908-943, 4274-75. On September 2, 2015, Dougherty was elected to the Building Trades position. Appx4275-76.

***Soda tax.*** For years, Philadelphia politicians had attempted to pass a Soda Tax to combat obesity, but had faced opposition, including from organized labor. Appx3812-15, 4359-60. According to the government, Henon offered support for the Soda Tax in May 2015 at

Dougherty's behest to retaliate against the local Teamsters union, whom Dougherty believed had funded an attack ad against him, and who opposed the tax ("Soda Tax #1"). Appx818-19. After talking with Dougherty, Henon's staff developed materials to support the soda tax, but ultimately did not introduce the bill at that time. Appx819-21. Henon continued supporting the Soda Tax in 2016 ("Soda Tax #2"), this time, according to the government, because Dougherty wanted to curry favor with the new mayor of Philadelphia, Jim Kenney. Appx821-22, 4258, 4289. The Kenney administration reframed the Soda Tax as a way to fund his key initiatives, including Pre-K and community infrastructure like parks. Appx4359-60. This time, Henon did actually introduce the soda tax in city council, and it eventually passed easily. Appx822, 4290-92.

*CHOP L&I Complaints*. In July and August 2015, Local 98 made several Department of Licenses and Inspections ("L&I") complaints about unlicensed contractors reportedly working at a new Children's Hospital of Philadelphia ("CHOP") facility. Appx822-24, 4256-58, 4278-85. At that time, CHOP was reportedly installing two new MRI machines, and relying on out-of-state technicians from the MRI manufacturers.

Appx822-23. The government alleged that Dougherty complained to Henon about the workers being non-union, and Henon then directed L&I to go to the jobsite and shut it down twice for licensing violations. Appx823-24, 1042-1101, 1357-1426, 1446-1460. A stop work order was issued, but CHOP continued with the installation. Appx1430-31, 4363. In August, after calls from Dougherty, Henon contacted the head of L&I to report that unlicensed contractors were still being used for a second MRI installation at CHOP, resulting in another stop work order. Appx1154-59, 1217-29, 4363-65.

***Comcast Franchise Agreement.*** In November and December 2015, the City of Philadelphia was negotiating a renewed 15-year franchise agreement with Comcast that would allow cable services within the city. Appx824-830, 4257, 4262-70, 4411-13. In late November, Henon raised concerns with Comcast about its use of contractors who did not pay the prevailing wage, or union rate. Appx2728-2736. On December 2, the day before a key hearing before the Public Property Committee, Henon set up a meeting, which included Comcast negotiators and Dougherty. Appx825, 828, 2523-30, 3055-57. Dougherty brought up the longstanding Petrick Agreement, a handshake deal from 1999 with

Comcast, whereby its cabling within buildings was done by union labor at the prevailing wage, or union rate. Appx4353-54. He wanted Comcast to also allow unions to bid on right-of-way work—i.e., cable work done *outside* of buildings and under streets or sidewalks—as well and hoped to formalize an agreement. Appx2644-48, 2747-55, 2761-63, 4353-56. The next day, Dougherty met with Comcast again and they agreed in principle that Comcast could use union workers for right-of-way work, so long as they charged no more than 125% of Comcast's rate card. Appx3059-62. Later that day, the franchise agreement was voted out of committee, and it was ultimately approved unanimously by City Council. Appx830, 3061, 4358-59. Afterwards, Comcast tried but failed to codify into writing the agreement it had reached with Dougherty. Appx2771-2778, 3063-3071, 4270.

***Towing.*** On the night of September 22, 2015, Dougherty had an incident where his car was about to be towed and the driver would only agree to let the car down if Dougherty paid him a fee. Appx830-31, 4270. The driver would not accept a credit card, which is unlawful, and was not able to provide change when Dougherty paid in cash. Appx831, 4270, 4366. Dougherty called several people, including Henon, complaining

about the incident and indicating that he wanted a bill addressing this tow company. Appx2388-2403, 2442-49, 4271. After Dougherty's call, Henon directed a staff member to draft a resolution, though it was ultimately not introduced. Appx833, 2492-94, 4271-72, 4366. Another councilmember was working on the issue and ultimately passed a bill in December 2016. Appx4115.

*PPA Audit.* Between June and September 2015, Henon opposed a performance audit of the Philadelphia Parking Authority ("PPA"). Appx833-35. The Chairman of the PPA, Joe Ashdale, wanted Henon to vote against the audit and provided $3,000 of glass for a house owned by Henon's chief of staff, Courtney Voss. Appx4258.

### 2. Embezzlement

The other set of charges against Dougherty related to a purported scheme by Dougherty and others between 2010 and 2016 to embezzle money from Local 98 to pay for groceries, meals, work on personal homes and properties, and salaries of friends and family members. Appx230-319. Dougherty's alleged co-conspirators included: Brian Burrows (president of Local 98), Michael Neill (training director of Local 98's Apprentice Training Fund), Marita Crawford (political director of Local

98), Niko Rodriguez (employee of Local 98's Apprentice Training Fund), Brian Fiocca (Local 98 office employee), and Anthony Massa (owner of construction company). Appx232-38. The government also charged a series of wire fraud thefts, as well as offenses related to filing requirements, record-keeping, and income tax returns, all related to the alleged embezzlement. Appx304-321.

The government alleged that hundreds of thousands of dollars were taken from Local 98 and its Apprentice Fund to pay Massa's construction company for construction on personal properties. Appx4852-53, 4893-95, 8429-51, 8589-96. Those properties included the residences of Dougherty, Burrows, and Neill, a bar that several of them owned, a commercial building owned by Burrows and Neill, and the residences of Dougherty's father, sister, brother, and daughter. Appx4852, 4893-94.

Next, Dougherty purportedly misused Local 98 credit cards and sought reimbursement from Local 98 for personal purchases. Appx4853-55, 4896-4906, 8452-65. The credit cards were allegedly used, either by Dougherty or by subordinates, to purchase personal and household items, as well as meals and lodging, including on personal trips and for events like birthdays. Appx4853-54, 4897-4900, 8452-82. Dougherty also

allegedly used union assets to pay for things like event tickets. Appx4855, 4905-06.

The government also believed Dougherty directed Local 98 to hire his family members and friends, and gave them raises and extra pay for hours not worked for Local 98. Appx4855-56, 4906-08, 8498-8514. For example, Dougherty's nephews and nieces were paid for work during time when they were at the shore, were in college, or were traveling abroad. Appx4856, 4907-08. And co-defendants Rodriguez and Fiocca reportedly ran personal errands for Dougherty while they were supposed to be working for Local 98. Appx4856.

Dougherty also allegedly stole from Local 98's Political Action Committee, the Committee on Political Education ("COPE"). Appx4856. Dougherty reportedly took petty cash from COPE for personal use and instructed others to withdraw money from COPE bank accounts for personal purchases instead of political use. Appx4857. Dougherty also reportedly stole from another PAC called New Gen 1, which had been formed for South Philadelphia's First Ward, and was largely funded by COPE. Appx4858-59, 4909-10, 8517-19.

The government also charged several crimes related to the

embezzlement and thefts, based on false reports and record keeping. Every year, Local 98 filed a Form LM-2 Labor Organization Annual Report with the Department of Labor. Appx4857, 4908. According to the government, Dougherty and Burrows made false statements in Local 98's 2015 and 2016 LM-2s, specifically about work that had been done on personal properties but was paid for by the union. Appx4858. They, likewise, made similar entries in internal records that Local 98 was required to keep. Appx4858. Dougherty, Burrows, and Neill were also charged with filing false federal income tax returns from 2012 to 2016, for failing to report what the government called "ill-gotten gains" described above. Appx4858, 4909.

## B.   Procedural history.

Dougherty was indicted in January 2019 and, in November 2020, the district court severed the case into two separate trials. Appx600-08. The court ordered that it would conduct one trial on what it called the "corruption counts" (Counts 97-116) and another on the "embezzlement counts" (Counts 1-87). Appx601-02, 607.[4]

---

[4] The court also identified a group of "labor bribery counts," but they were ultimately dismissed. *See supra* n.2.

### 1. Honest services fraud case.

Dougherty and Henon were tried on the "corruption counts" from October 5 to November 15, 2021. Appx790-4702.

Before the trial, Dougherty moved to dismiss all the related counts against him (Counts 97-109). Appx384-416. He explained that the fraud alleged by the government was, in fact, normal and lawful lobbying of a city councilmember to advance labor interests. The government sought to punish a potential conflict of interest, but framed it as bribery, without actually alleging a payment made by Dougherty or the requisite intent by the defendants. Appx408-15. At the very least, Dougherty argued the honest services fraud statute was unconstitutionally vague as applied. Appx399-401. After further briefing by the parties and a hearing, Appx417-599, the district court denied the motion. Appx21-57.

At trial, the government sought to prove its theory that, through Local 98, Dougherty paid Henon a stream of benefits in the form of his salary and benefits like tickets, and, in return, Henon performed certain acts at his behest. But there was no evidence that Dougherty specifically authorized the salary payments to Henon—Henon's ongoing salary starting in 2012 was authorized by Burrows, and he was paid on an

ongoing basis by direct deposit. Appx2140, 2169-71, 4344-45, 4351. The government also tried to show that Henon did not actually do any work for Local 98 at this time, Appx4245-47, 4424-26, but the defense countered that, in that capacity, he attended Building Trades and AFL-CIO meetings, participated in Local 98 meetings and events, and assisted with political campaigns for labor-friendly candidates. Appx4389-91. And while the government pointed to tickets that Henon received from Local 98 during this time as part of the bribery scheme, several witnesses also testified that Local 98 had those tickets for business development purposes, and they were frequently used by employees and local politicians. Appx4347-49, 4394-95.

Dougherty also disputed the government's official act theories, including by arguing:

- Henon had simply sought Dougherty's advice on the plumbing code issue, and ultimately did not actually take any action on the plumbing code, Appx4366-67, 4408;

- Henon had been working on the soda tax with then-Mayor Michael Nutter for months before that time, Appx3816-19, 3995-97, 4116-20, 4406-07;

- It was the Local 98 safety coordinator, not Henon, who contacted L&I to report that CHOP was using unlicensed contractors, Appx1123-1144, 1215-1217, 1430-31, 3723-3738, 4364, and evidence showed that it was not uncommon for unions or other city councilmembers to

contact L&I to report things like unlicensed contractors, Appx4337, 4362-63;

- Prior to Dougherty's towing incident, Henon had already been focused on the issue because Henon's car was towed by the same company, and he had spoken with the District Attorney's office, which was already investigating ongoing related issues. Appx2460-66, 4106-14, 4404-06;

- Dougherty's meeting with Comcast negotiators was not part of any bribe, but was normal considering he was the head of Building Trades, and was there advocating for union work, along with Henon who was pro labor. Appx4353-59; and

- Dougherty had not made any request on the PPA issue and, in fact, Henon only reached out to him for advice on the question. Appx64.

After the government rested, Dougherty raised similar issues to those from his motion to dismiss in a Rule 29 motion for judgment of acquittal. Appx3452-92, 3505-3649. The district court denied the motion, except as to the PPA audit, in which Dougherty was not involved. Appx59-68. The court agreed with Dougherty that there had never been a case where "a presumedly legal benefit turned into an illegal bribe based upon the recipient being in public office and corresponding with the payoff of the benefit." Appx59. And the court expressed concerns about the "current state of honest services fraud law," because it could expose other Philadelphia city councilmembers to prosecution for maintaining outside employment, permitted in Philadelphia,

communicating with their employer, and then acting in relation to that communication. Appx62 n.3. But it found that the government had presented sufficient evidence of bribery under the Third Circuit's stream-of-benefits precedent to present the case to the jury. Appx59-63.

After a six-week trial, the jury found Dougherty guilty of conspiracy, as well as the substantive counts of honest services fraud associated with the August L&I/CHOP conduct, the plumbing code, the towing resolution, the Comcast negotiation, and Soda Tax #2. Appx4699-4702. It found him not guilty on the substantive counts related to the July L&I/CHOP conduct and Soda Tax #1. Appx4699-4702. After the verdict, Dougherty filed another motion, pursuant to Rule 29(c) and Rule 33, seeking judgment of acquittal or a new trial. Appx4703-39. The motion raised substantially the same issues identified in the prior Rule 29 motion. The court denied the motion. Appx69-84.

## 2. Motion to dismiss based on conflicted counsel.

In September 2022, Dougherty's attorneys (specifically, the lead attorney hereinafter referred to as "Attorney 1"), who had represented him in the first trial (from what is referred to here as "the Firm"), were permitted to withdraw, and Dougherty was appointed new counsel. DE

345, 355, 375, 361, 372, 404. In February 2023, Dougherty moved to dismiss all charges and/or vacate his honest services fraud convictions. S.Appx110-31. He argued he was deprived of his right to conflict-free counsel under the Fifth and Sixth Amendments. Specifically, while Dougherty was represented by attorneys at the Firm, the Firm also represented Comcast, a significant actor in the honest services fraud trial. S.Appx112-14.[5] Indeed, Comcast employed the Firm to draft the side agreement with Dougherty that was the subject of his honest services fraud prosecution, and Dougherty's attorneys from the Firm cross-examined a witness about it. S.Appx113-14; Appx2943.

In the subsequent months, the court held argument on the issue, *see* S.Appx187-219, and Dougherty filed additional briefing raising other potential conflict issues, and providing an expert opinion that both the defense and prosecution had failed their ethical obligations to Dougherty. *See* S.Appx132-42, 220-59; Appx8822-47. The court elected to hold the embezzlement trial before deciding the conflict issue.

On March 20, 2024, the court held an evidentiary hearing on the

---

[5] Other potential conflicts were raised, S.Appx114-16, 191-92, but were later withdrawn, Appx8853-56.

conflict motion. Appx8848-9025. The hearing focused on whether Attorney 1 and the Firm had a conflict of interest that prevented them from calling David L. Cohen, an Executive Vice President at Comcast, who had also previously worked at the Firm, as a defense witness, and from conducting an adequate cross-examination of Kathleen Sullivan, another Comcast employee. Appx8852-56. Attorney 1 and Dougherty were the only witnesses. Following the hearing, the parties filed supplemental briefing. Appx9026-73. In July 2024, the district court denied the motion. Appx105-20.

### 3. Motion to dismiss based on government's use of confidential informant.

In February 2023, Dougherty, also moved to dismiss the Indictment based on his discovery that the government had been surreptitiously recording him through a confidential informant ("CI"), in violation of the Fifth and Sixth Amendments. S.Appx60-109. Starting in the summer of 2020, while Dougherty was in active preparation for his first trial, the government engaged a CI to investigate him. S.Appx61-62. The CI recorded meetings with Dougherty and members of Local 98 and provided the recordings to the government through the fall of 2021, while he was on trial, and even after Dougherty learned of and raised concerns

about the issue in the spring of 2022. S.Appx62.

For background, the existence of the CI was not disclosed in this case, but in a separate extortion case in which the charges against Dougherty were ultimately dismissed after a hung jury and mistrial. *See United States v. Dougherty*, No. 2:21-cr-65, ECF No. 1 (E.D. Pa. March 2, 2021). In March 2022, as part of that extortion case, the government turned over a recording of a Local 98 meeting from August 24, 2020, to the defense and, after questions from the defense, revealed it "was recorded by a CI whose identity we do not intend to disclose." S.Appx106-07. The defense expressed serious concerns and filed discovery and other requests with the court. Soon after, the government admitted the CI had begun supplying information to the government in July 2020,[6] but disclosed that there were only three or four recordings. S.Appx71. A few weeks later, the government acknowledged the CI had provided approximately 30 recordings during their investigation but did not divulge at the time that it also had source reports (i.e., summaries of contacts between the CI and agent). S.Appx71.

---

[6] The CI had actually begun independently and unlawfully recording Dougherty in September 2019 and did so on at least four occasions. S.Appx64 n.3.

There was extensive litigation in the subsequent months in the extortion case, with the district court ordering an *in camera* review of the materials, and the government subsequently providing heavily redacted transcripts, and later, unredacted transcripts, summaries of source reports, and eventually source reports. S.Appx71-72. The court also held a lengthy hearing in June 2022 to assess the government's procedures with the CI after which it ordered additional discovery from the government. *See United States v. Dougherty*, No. 2:21-cr-65, ECF No. 108 (E.D. Pa. Jul. 7, 2022). The government never produced the underlying recordings and defense counsel below questioned whether all source reports had been provided. S.Appx72.[7] Dougherty also learned later that there may have been *multiple* CIs, but not until April 2024, long after both of his trials in this case, and when he was represented by new counsel.[8]

---

[7] Dougherty's counsel also later raised concerns that the "record created thus far has been curated by the government," and "is simply not sufficient to address the issues created by the government's decision to engage the CI." S.Appx65. Undersigned counsel was not provided the materials described above, but was permitted to visit the U.S. Attorney's Office and review select materials under the supervision of their staff. Those materials included transcripts of recordings and selected summaries of some source reports, but not the source reports themselves.

[8] On April 17, 2024, Dougherty's counsel informed the court that

After Dougherty raised the CI concern in *this* case, by motion to dismiss in February 2023, S.Appx60-109, the government filed a response, Appx4822-44, and the court heard oral argument on the issue, S.Appx165-87. Dougherty argued that the use of the CI had violated his Fifth and Sixth Amendment rights, because it allowed the government to gain insight into his thoughts and counselled strategy as he prepared for trial. S.Appx62, 77-85. He also explained that the procedures and use of a filter team did not resolve those errors and failed to adequately protect his rights. S.Appx62, 85-93. Finally, he argued that the government's conduct was "outrageous" enough to have violated his due process rights under the Fifth Amendment. S.Appx93-96. In July 2023, the court denied the motion to dismiss. Appx85-104.

### 4. Embezzlement case.

Most of the co-defendants in the embezzlement counts pleaded guilty, but Dougherty and Burrows proceeded to trial, which took place

---

he had received a heavily redacted search warrant affidavit that referred to three different confidential sources. *See United States v. Dougherty*, No. 2:21-cr-65, ECF No. 191 at 6-16 (E.D. Pa. Aug. 14, 2024); *see also United States v. Dougherty*, No. 2:21-cr-65, ECF No. 188 at 34-35 (E.D. Pa. Jul. 17, 2024) (transcript of Agent Jason Blake acknowledging the existence of multiple CIs in this case).

from November 2 to December 5, 2023. Appx4886-8812.

The government's case focused on alleged embezzlement, specifically: that Anthony Massa had done work on Dougherty and Burrows's personal properties and billed Local 98, that Dougherty and subordinates used company credits cards for or were reimbursed for personal expenses, and that Dougherty got Local 98 to pay his friends and family for low- or no-show jobs. It also asserted that the embezzlement resulted in inaccurate recordkeeping, reporting, and tax returns.

Dougherty disputed all these charges, arguing that his behavior was "negligent" not "fraudulent." Appx4913. According to Dougherty, the charged expenses reflected his efforts to compete in the corporate and political worlds, which had helped grow the union and improve its member's wages. Appx4914. Dougherty also argued that when subordinates did personal tasks for him, he was not trying to steal money, he was freeing up his own time to do Local 98 business. Appx4919. But Dougherty was unaware that those employees also used the Local 98 credit cards for their own personal expenses. Appx4919-20, 8549.

Dougherty did the "best he could," Appx4917, but mistakes in

reporting reflected that Dougherty was so busy that paperwork was often completed months or longer after the fact. Appx4915. But he never asked somebody to "fraudulently represent something on an expense report[.]" Appx8550. And any criminal intent was belied by Dougherty's decision to bring in an outside accounting firm to audit Local 98's financials in 2016. Appx4921, 8550, 8554-55.

Dougherty also specifically disputed the charges related to Massa's construction company. Appx8536-44. He argued that Massa had promised to do work for him as a favor and then, unbeknownst to Dougherty, padded the bills and submitted them to Local 98. Appx4924-25. Burrows was reportedly the one who directed Massa to "falsely bill the union for the work," Appx8444, and Massa acknowledged he led Dougherty to "believe that he was not charging for his work." Appx8537.

The jury found Dougherty guilty of conspiracy and most of the substantive embezzlement counts, but found him not guilty on Counts 9 and 47 (related to February 2015 IKEA purchases), and Count 74 (related to his 2012 tax return). Appx8804-12.

Dougherty and Burrows moved for judgment of acquittal at the close of the government's case, Appx8201-02, 8237-74; DE 609, 610, and

after the jury's verdict, DE 652, 653, 655, 683, 741. The defendants both argued that the government's conspiracy theory constituted a variance, because the Indictment charged a single unified conspiracy, but the trial set forth numerous distinct conspiracies. *See, e.g.*, DE 609. Dougherty also argued that he should be acquitted on all counts related to Massa's construction work, because there was no evidence Dougherty knew about the work being billed to Local 98 and, in fact, Massa testified that he never told Dougherty about it. *See, e.g.*, DE 683. In June 2024, the court denied the defendants' motions. *See* DE 747.

### 5. Sentencing.

In July 2024, Dougherty was sentenced to a total of 72 months imprisonment for the offenses for which the jury found him guilty in both the honest services fraud and embezzlement trials. Appx5. The court determined Dougherty had a criminal history category of I and an offense level of 33, and calculated his Guidelines range as 108 to 135 months' imprisonment. Appx9153; SOR at 1. But it sentenced Dougherty below that range to 72 months. The court recognized the "dual nature" of Dougherty's conduct, which included the crimes of conviction, but also his extensive charitable works, contributions to Local 98's growth and to the

community, and his care for his ailing wife. Appx9153-58; SOR at 3.

This timely appeal followed. Appx1.

## Summary of the Arguments

Several district court errors merit vacatur of Dougherty's convictions on some or all counts.

First, the district court erroneously denied Dougherty's motion to dismiss the honest services fraud counts. The government charged a novel theory of honest services fraud bribery—that Henon's ongoing employment at Local 98 constituted a stream of benefits from Dougherty in exchange for any potential official actions that might arise. The theory was indistinguishable from previous conflict-of-interest cases, which are no longer viable. The charges should have been dismissed because: (1) they failed to identify that, at any time, Dougherty and Henon entered into a *quid pro quo* agreement with the requisite corrupt intent, and (2) the honest services fraud statute is unconstitutionally vague as applied. Accordingly, the Court should vacate Dougherty's honest services fraud convictions.

Second, the district court erroneously denied Dougherty's Rule 29 motions, and this Court should find that the evidence at the honest services fraud trial was insufficient. The trial bore out many of the same concerns raised by the motion to dismiss, including that: (1) the

government's theory was conflict-of-interest, not bribery; and the government failed to show (2) Dougherty paid or authorized any bribes; (3) Dougherty had corrupt intent at the time he authorized any ongoing payment or otherwise at the outset of the purported stream of benefits; (4) Dougherty intended to influence a specific "question or matter" at that time; and (5) any of Henon's actions amounted to "official acts." Accordingly, the Court should vacate Dougherty's honest services fraud convictions.

Third, the district court made several errors in its honest services fraud jury instructions: it (1) denied an instruction that any *quid pro quo* agreement had to contemplate action on a "specific and focused question or matter," as required in the Second Circuit; (2) gave a non-Model mixed motive instruction that misstated the law, minimized the government's burden to show *mens rea*, and likely confused the jury; and (3) modified the Model "official act" instruction and effectively relieved the government of its burden to prove part of that element. Accordingly, the Court should vacate Dougherty's honest services fraud convictions.

Fourth, the district court erred by denying Dougherty's motion to dismiss based on an attorney conflict. Defendants have a Sixth

Amendment right to conflict-free counsel and, here, Attorney 1 represented Dougherty while his Firm also represented an interested party, Comcast, including on the Franchise Agreement at issue in Dougherty's case. The conflict adversely affected Attorney 1's performance, as he acknowledged avoiding treating Comcast as an adversary, declined to call a defense-friendly Comcast executive as a witness, and limited his cross-examination of a Comcast employee called by the government. Accordingly, the Court should vacate Dougherty's honest services fraud convictions.

Fifth, the district court erred by denying Dougherty's motion to dismiss based on the government's improper use of a confidential informant. The government's reliance on a confidential informant to illegally record Dougherty after his right to counsel had attached violated his Sixth Amendment rights. The actions clearly risked and, in fact, *did* provide the government with insight into Dougherty's potential defense strategies. And the government's use of a filter team was riddled with errors and failed to cure any violation. Accordingly, the Court should vacate all of Dougherty's convictions from both the honest services fraud and embezzlement trials.

Sixth, the district court made two key errors in its embezzlement jury instructions: it (1) gave a disfavored willful blindness instruction that was improper given the *mens rea* in this case and, in any event, was never adequately justified by the government; and (2) misstated black-letter Third Circuit law when it modified the Model "good faith defense" instruction to say good faith was *not* a complete defense. Accordingly, the Court should vacate Dougherty's embezzlement convictions.

<center>**Argument**</center>

**I.  The district court should have granted Dougherty's motion to dismiss Counts 97-109 because his charged conduct did not constitute honest services fraud.**

**Standard of Review:** The Court applies a "mixed standard of review to a district court's decision on a motion to dismiss an indictment, exercising plenary review of legal conclusions and clear error review over factual findings." *United States v. Islam*, 102 F.4th 143, 148 (3d Cir. 2024) (citation omitted).

The district court should have dismissed the honest services fraud charges (Counts 97-109) against Dougherty. Appx384-416. The government's theory was that Henon, as a city councilmember, continued to receive a salary from his longtime employer, Local 98, and took actions that benefited Local 98. That is not a bribe. It is, at worst, a conflict of interest, which can no longer be charged under the honest-services fraud statute. Specifically, the charges should have been dismissed because: (1) they failed to allege that Dougherty had the corrupt intent to influence official action at the time of any *quid pro quo* agreement; and (2) the honest-services fraud statute is unconstitutionally vague as applied to Dougherty under the government's novel theory. For all these reasons, this Court should vacate Dougherty's convictions on all the honest services fraud counts.

<center>39</center>

**A. Honest services fraud prosecutions are limited to the core of bribery and kickbacks to avoid federal overreach into local public corruption concerns.**

"'Honest services fraud' has proven hard to define." *United States v. Wright*, 665 F.3d 560, 567 (3d Cir. 2012). As "a general matter, States have the 'prerogative to regulate the permissible scope of interactions between state officials and their constituents.'" *Snyder v. United States*, 603 U.S. 1, 14 (2024) (citation omitted). But, by the mid-twentieth century, courts had begun to sanction the use of the wire and mail fraud statutes to federally target public corruption, citing the intangible right of the public to the "honest services" of their elected officials. *See Skilling v. United States*, 561 U.S. 358, 399-401 (2010). In 1987, the Supreme Court "stopped the development of the intangible-rights doctrine," *id.* at 401, and held that the mail fraud statute was "limited in scope to the protection of property rights." *McNally v. United States*, 483 U.S. 350, 360 (1987). Congress quickly responded to ensure the fraud statutes covered the "intangible right of honest services," *Cleveland v. United States*, 531 U.S. 12, 19-20 (2000), by defining "scheme or artifice to defraud," to include a "scheme or artifice to deprive another of the intangible right of honest services." 18 U.S.C § 1346.

Still, courts have continued to curb overreaching efforts to use the federal fraud statutes to police state and local public corruption. The Supreme Court has repeatedly reiterated that "the fraud statutes do not vest a general power in 'the Federal government … to enforce (its view of) integrity in broad swaths of state and local policymaking.'" *Ciminelli v. United States*, 598 U.S. 306, 312 (2023) (quoting *Kelly v. United States*, 590 U.S. 391, 404 (2020)). For a time, courts recognized two types of honest services fraud: "(1) bribery where a legislator was paid for a particular decision or action; or (2) failure to disclose a conflict of interest resulting in personal gain." *United States v. Panarella*, 277 F.3d 678, 690 (3d Cir. 2002). But, in 2010, the Supreme Court ended the conflict-of-interest theory, and limited honest services fraud to its core of bribery and kickbacks. *Skilling*, 561 U.S. at 408-09.

"The bribery-and-kickback theory of honest services fraud requires 'a *quid pro quo*, that is, a specific intent to give or receive something of value *in exchange* for an official act." *United States v. Ciavarella*, 716 F.3d 705, 729 (3d Cir. 2013) (quoting *Wright*, 665 F.3d at 567-58). An "official act" is a "decision or action on a 'question, matter, cause, suit, proceeding or controversy,'" which must "involve a formal exercise of governmental

41

power," and must be "something specific and focused that is 'pending' or 'may by law be brought' before a public official." *McDonnell v. United States*, 579 U.S. 550, 572-73 (2016). The government must show that the "public official agreed to perform an 'official act' at the time of the alleged *quid pro quo*." *Id.* at 572-73.

**B. The government did not allege that Dougherty had a specific corrupt intent in connection with any agreement or *quid.***

**1. The government's bribery theory failed because it did not argue that Dougherty had corrupt intent at the beginning of the stream-of-benefits arrangement.**

The honest services counts failed as a matter of law because the government did not allege that Dougherty had a specific intent to influence official action when any purported agreement or *quid* was offered or paid. *See* Appx406-08; *see also Wright*, 665 F.3d at 568. There is a "critical timing component" to bribery, whereby a payor must intend to influence official action at the time that he or she offers or pays a bribe to a public official. Appx407.

The government advanced a "stream of benefits" theory of bribery. It alleged that Dougherty, "through Local 98, provided [Henon] with a stream of personal benefits during the time that [Henon] was a member

42

of Philadelphia City Council," Appx339, and that Dougherty gave things of value to Henon in order to influence him and in exchange for Henon "performing official acts as directed by and on behalf of Dougherty." Appx340; *see also* Appx423-25, 427-30.

Under a stream-of-benefits theory, a *quid pro quo* is shown by a "course of conduct of favors and gifts flowing to a public official *in exchange for* a pattern of official actions favorable to the donor." *United States v. Kemp*, 500 F.3d 257, 282 (3d Cir. 2007) (citation omitted). "Thus, 'payments may be made with the intent to retain the official's services on an 'as needed' basis, so that whenever the opportunity presents itself the official will take specific action on the payor's behalf.'" *Id.* (citation omitted). But this theory still must allege bribery, meaning the government must allege the "essential element—a specific intent to give or receive something of value *in exchange* for an official act[.]" *Id.* It is not enough to allege a "noncriminal gift extended to a public official merely 'to build a reservoir of goodwill that might ultimately affect one or more of a multitude of unspecified acts, now and in the future.'" *Id.* at 281.

The government's stream-of-benefits theory failed because it never sufficiently alleged that Dougherty possessed corrupt intent as part of an

agreement or *quid* at the beginning of this purported stream of benefits. Indeed, the government was noncommittal about what action by Dougherty was supposed to be the *quid* at all, or that entered him into this supposed stream-of-benefits arrangement. It disclaimed reliance on Local 98's initial employment of Henon in 1998 or retention of him in 2012. *See* Appx427-28. This assuredly would have preceded any alleged corrupt intent and been, at worst, a "noncriminal gift" intended "to build a reservoir of goodwill." *See Kemp*, 500 F.3d at 281. And, consistent with a stream-of-benefits theory, the government disclaimed that any of Henon's specific salary payments were given with the specific intent to influence some action. *See* Appx428-29. The government insisted that the stream of benefits—primarily Henon's salary—was in totality given in exchange for future official acts. Appx429. But that only gets the stream-of-benefits theory partially right. The Indictment does not allege any involvement by Dougherty in those ongoing salary payments, or any decision by Dougherty between 2012 and 2015 that those salary payments would now be transformed into bribes. *See* Appx402-06

While the stream-of-benefits theory might relieve the government's obligation to prove individual *quid pro quos* for each official act, it does

not obviate the "critical timing component," Dougherty identified. *See United States v. Menendez,* 291 F. Supp. 3d 606, 620 (D.N.J. 2018) ("the relevant timing in a bribery case is that of the agreement (and not any resulting exchange) …"). Timing is a crucial part of any bribery allegation, because it distinguishes bribes from gratuities. *See Snyder,* 603 U.S. at 5 ("bribes are payments made or agreed to *before* an official act in order to influence the official with respect to that future official act"). And *McDonnell's* holdings "do seem to impose a burden on the government to establish that the transacting parties agreed that, in exchange for a thing of value, a public official would provide assistance on a particular, *ex-ante*-identified matter." *United States v. Burnette,* 65 F.4th 591, 612-13 (11th Cir. 2023) (Jordan, Rosenbaum, and Newsom, JJ., concurring) (emphasis in original).

In fact, the stream-of-benefits theory makes the timing more critical, because it inherently requires the government to show a corrupt *quid pro quo* understanding *at the beginning* of the stream of benefits. *Cf. United States v. Lopez-Cotto,* 884 F.3d 1, 8 (1st Cir. 2018) ("the prosecution must prove an agreement for the ongoing stream of benefits rather than an agreement for stand-alone bribes"); *United States v.*

*Ganim*, 510 F.3d 134, 147 (2d Cir. 2007) ("*Once the quid pro quo has been established* … the specific transactions comprising the illegal scheme need not match up this for that." (emphasis added)). Afterall, a *quid pro quo* offense is "completed at the time when the public official receives a payment in return for his agreement to perform specific official acts[.]" *Evans v. United States*, 504 U.S. 255, 268 (1992) (construing extortion).

The alternative would effectively eliminate the intent element of the *quid pro quo* and the agreement element of conspiracy, risking parties unwittingly stumbling into bribery arrangements. *See United States v. Lynch*, 807 F. Supp. 2d 224, 233 (E.D. Pa. 2011) (information failed "to allege any intent on the part of either defendant with respect to specific actions *at the time* of the improper payment" (emphasis added)); *United States v. Householder*, 137 F.4th 454, 471 (6th Cir. 2025) ("honest services fraud requires a quid pro quo agreement rather than a more lenient showing of general influence, … to show a quid pro quo, the government must show a 'meeting of the minds and specific, agreed-upon terms.'" (citation omitted)); *see also United States v. Varelli*, 407 F.2d 735, 743 (7th Cir. 1969) ("While the crime of conspiracy is completed as soon as the unlawful agreement is formed, … it must be shown that this

agreement was made prior to or during the consummation of the single act." (citation omitted)). Requiring an *ex ante* intent to influence an official act is essential to distinguish between *Kemp*'s stream of benefits theory and what it identifies as a lawful gift to curry favor. *Lynch*, 807 F. Supp. 2d at 233 n.3; *see also* Alschuler at 481 ("Words and actions that follow the receipt of a benefit may supply evidence of what the donor and recipient intended when it was received, but they cannot transform a benefit that was lawful at that time into a bribe.").

This comports with how this Court has understood the timing of the intent in another case where a public official's private employment was considered a stream of benefits. *See United States v. Bryant*, 655 F.3d 232, 240-43 (3d Cir. 2011) (dean of medical school bribed state senator by giving low-show job—i.e., a salary as a stream of benefits—in exchange for directing funding to the school). There, the corrupt intent was present *at the offer* of employment.

Because the government failed to allege that Dougherty had the requisite corrupt intent at the time of any alleged *quid*, these counts failed as a matter of law, and this Court should vacate Dougherty's honest services fraud convictions.

**2. The government failed to allege that Dougherty intended to influence a specific "question or matter" at the time of the *quid pro quo*, as required in *Silver*.**

The honest services counts also failed as a matter of law for an additional, related reason: the government failed to allege that Dougherty intended to influence a specific "question or matter" at the time of any *quid pro quo*.

Much of the stream of benefits caselaw preceded *Skilling* and *McDonnell*, so it must be reconciled with those cases. The theory certainly cannot be advanced as a substitute for a conflict of interest, or to circumvent the requirement of a contemporaneous *quid pro quo* agreement between the parties.[9]

---

[9] Scholars have commented that *McDonnell* "will likely prohibit honest services fraud charges premised on '"stream of benefits' or 'as opportunities arise' theories of bribery[.]" Bridget Vuona, *Remember Me, "Part C"?: Honest Services Fraud Schemes Involving Bribery Under "Part C""" of the Federal Bribery Statute Post-McDonnell*, 55 Am. Crim. L. Rev. Online 35, 39 (2018). Dougherty does not concede that the stream of benefits theory remains viable after *McDonnell*. But courts, including this one, have continued to accept the theory even after *McDonnell*. *See United States v. Fattah*, 914 F.3d 112, 158 (3d Cir. 2019); *United States v. Davis*, 841 F. App'x 375, 380 (3d Cir. 2021) (unpublished); *Menendez*, 291 F. Supp. 3d at 613-17; *see also United States v. Repak*, 852 F.3d 230, 250-51 (3d Cir. 2017) (applying "as opportunities arise" theory of extortion, post-*McDonnell*). Therefore, to avoid confusion, counsel believes the issue is better addressed by the *en banc* Court or the Supreme Court, and preserves an objection to the stream-of-benefits

The Second Circuit has attempted to reconcile *McDonnell* with bribery theories like stream-of-benefits. *See United States v. Silver*, 948 F.3d 538, 550-69 (2d Cir. 2020). An "'as the opportunities arise' theory of bribery requires more than ... an open-ended promise to perform official actions 'for the benefit of the payor.'" *Id.* at 559. "*McDonnell* re-emphasizes that the relevant point in time in a *quid pro quo* bribery scheme is the *moment at which the public official accepts the payment*." *Id.* at 556. And, at "the time the bribe is made, the promised official act must relate to a 'properly defined' 'question, matter, cause, suit, proceeding or controversy.'" *Id.* (citing *McDonnell*, 579 U.S. at 579). While the specific official action need not be established, the "question or matter" must be "properly defined[.]" *Id.* at 556-57. A promise to "take— as the opportunities arise—'*any* decision or action on any question, matter, cause, suit, proceeding or controversy'" would be "so vague as to be meaningless." *Id.* at 556. "*McDonnell* did not invalidate all 'as opportunities arise' bribery—only convictions for bribery schemes that are akin to payment of a retainer for services yet to be determined." *United States v. Hills*, 27 F.4th 1155, 1179 (6th Cir. 2022); *see also*

theory for future review.

49

*Burnette*, 65 F.4th at 614 (Jordan, Rosenbaum, and Newsom, JJ., concurring) (agreeing with *Silver* that "[a]fter *McDonnell*, it seems to us that so hazy a promise can't form the basis of a bribery conviction"); *United States v. Madigan*, ___ F.4th ___, 2026 WL 1133645, at *3 (7th Cir. Apr. 27, 2026) (agreeing with *Silver*).

This Court should follow the Second Circuit. So, to square its stream-of-benefits theory with *McDonnell*, the government needed to allege and prove that at the time of the purported *quid pro quo*—a matter still unclear on appeal—Dougherty intended to influence acts specifically as to an identified question or matter. *See Madigan*, 2026 WL 1133645, at *3 (holding jury was properly instructed that defendant "agreed—at the moment he joined the scheme—to take an official act on a specific question or matter"). The Indictment clearly alleged no such thing.

The government's ambiguous stream-of-benefits theory is exactly what *Silver*, and even *Kemp*, foreclose. Whether the purported *quid* was the decision to keep Henon employed in 2012, or any or all of the specifically charged benefits paid to Henon between 2015 and 2016, the government never alleged that at the time of such a payment, the parties were contemplating a *quo* with respect to a "properly defined" "question

or matter."[10] Rather, the government relied on an impermissible theory: that Local 98 paid Henon to "build a reservoir of goodwill that might ultimately affect one or more of a multitude of unspecified acts," *see Kemp*, 500 F.3d at 281, or, stated differently, that Henon accepted payments, promising to take "any decision or action on any question," which is "so vague as to be meaningless," *see Silver*, 948 F.3d at 556. Indeed, the government's theory was even vaguer than that, because it lacked both a focused *quo* and a focused *quid*. The government's theory was that there was a free-flowing stream of benefits, and a free-flowing stream of official acts, but none of which ever needed to be connected through specific *quid pro quos* or an overarching *quid pro quo*. That is, at worst, a conflict-of-interest, not a bribe.

The district court did not disagree with any of that but found *Silver* inapposite, because it believed it only applied to the *official*'s intent, not that of the *payor*. Appx34. But the Second Circuit drew no such distinction—it focused on the intent of the official, because the defendant

---

[10] The government faced a Catch-22—if the *quid* was the employment decision in 2011, it would have lacked any corrupt intent; if it was the ongoing employment as of 2015, the government could not articulate Dougherty's involvement in the payment. Appx4810-11.

in that case was the official. It certainly never held that *only* the official needs to have a specific "question or matter" in mind. To the contrary, it held that "*McDonnell* requires that the official understand the particular question or matter to be influenced at the time of the promise." 948 F.3d at 553. The question is "to be influenced" by the payor, so he assuredly must know it as well. Indeed, *Silver* held that the "public official must, at minimum, promise to influence a 'focused and concrete' 'question or matter' ..." *Id.* The promise is, of course, made to the payor, and if it was on some "question or matter" that was of no interest to him, then the "official essentially promised nothing in return for the payment." *Id.* at 557. And while the district court determined that *Silver* did not require the "official and payor to share a common intent or purpose," Appx34, that is precisely what is required in a conspiracy and a bribery scheme, and *Silver* specifically discusses an "understanding between the payor and the official" on this issue. *Id.* It would be passing strange to say that the briber could pay for some influence, but only the public official would need to know ahead of time the matter to be influenced.

Because the government failed to allege that Dougherty intended to influence a specific "question or matter" at the time of the *quid*, these

counts failed as a matter of law, and this Court should vacate Dougherty's honest services fraud convictions.

**C. The honest services fraud statute is unconstitutionally vague as applied to Dougherty.**

At the very least, the honest services fraud statute is unconstitutionally vague as applied to Dougherty and his conduct. *See* Appx399-401.

"It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). "The vagueness doctrine is premised on fairness, and thus requires that individuals are given 'fair warning' of their legal obligations." *United States v. Maloney*, 513 F.3d 350, 357 (3d Cir. 2008) (citing *San Filippo v. Bongiovanni*, 961 F.2d 1125, 1135-36 (3d Cir. 1992)). The government violates due process when it takes away somebody's liberty "under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015) (citation omitted). Courts "consider whether a statute is vague as applied to the particular facts at issue[.]" *Holder v. Humanitarian L. Project*, 561 U.S. 1, 19 (2010).

"Honest-services fraud and this Court's vagueness jurisprudence are old friends." *Percoco*, 598 U.S. at 333 (Gorsuch, J., concurring). Prior to § 1346's passage, the Supreme Court recognized that construing the fraud statues to extend to honest services fraud left their "outer boundaries ambiguous[.]" *McNally*, 483 U.S. 360. That ambiguity was not resolved by Congress's decision to codify the same vague honest services fraud doctrine. "Nothing in the new law attempted to resolve when the duty of honest services arises, what sources of law create that duty, or what amounts to a breach of it." *Percoco*, 598 U.S. at 334 (Gorsuch, J., concurring). The *Skilling* Court attempted to salvage the statute by construing it narrowly, despite agreeing that the "vagueness challenge has force," 561 U.S. at 405, and despite three Justices stating they would have held the law unconstitutionally vague, *id.* at 415-25 (Scalia, J., concurring in part). As Justice Scalia explained, the "doctrine provides no 'ascertainable standard of guilt [.]'" *Id.* at 416 (citation omitted). More recently, Justice Gorsuch joined the ranks of those who would find the law unconstitutionally vague. *See Percoco*, 598 U.S. at 333-38 (Gorsuch, J., concurring).

Ordinary people, like Dougherty, are simply not on notice that

54

Henon's employment arrangement could constitute honest services fraud. Henon had been employee of Local 98 since 2003 and maintained that employment after his election to City Council for several years before the charged conduct. Appx399-400. The arrangement was disclosed and was entirely permissible under local ethics rules. Appx28, 400. And it is undisputed that Henon was permitted to take constituent calls and to take actions that might benefit labor or Local 98 specifically. Appx400; *cf. McDonnell*, 579 U.S. at 575 ("The basic compact underlying representative government *assumes* that public officials will hear from their constituents and act appropriately on their concerns[.]"). But the government theorized that, around 2015, that lawful arrangement transformed into a bribery scheme because Henon engaged in purported official acts after communications with Dougherty.

The honest services fraud statute does not put the public on notice that this type of otherwise lawful employment arrangement is a crime. Under the government's reading of § 1346, city councilmembers who maintain outside employment are always at risk of federal charges if they take actions that could benefit their employer. They would have to think twice about fielding normal constituent calls from their employers or

colleagues. And they would, ironically, be the most at risk of accusations of impropriety if they engaged in any official acts that overlapped with their area of employment, despite that likely being their area of specialty or unique knowledge. As in *McDonnell*, the:

> Government's position could cast a pall of potential prosecution over these relationships if the union had given a campaign contribution in the past or the homeowners invited the official to join them on their annual outing to the ball game. Officials might wonder whether they could respond to even the most commonplace requests for assistance, and citizens with legitimate concerns might shrink from participating in democratic discourse.

579 U.S. at 575.

The district court, likewise, acknowledged this type of uncertainty below, explaining:

> What complicates this case is that the City of Philadelphia has determined that Philadelphia City Councilmembers may retain outside employment in addition to their City salary and benefits. Thus, Councilmember Henon's salary and benefits are legal under the Philadelphia City Charter. However, as per the Government's allegations, Councilmember Henon's Local 98 salary and benefits turn into an illegal stream of benefits when Henon communicates with his Local 98 boss, Dougherty, and then acts in relation to that communication with a corrupt intent. Under the Federal Government's prosecution, which I have held was properly brought under the law, every Philadelphia City Councilmember or any public official in the United States, who retains a salary from an outside employer, communicates with that outside employer, and then acts or agrees to act in relation to that

communication are then susceptible to a honest services fraud prosecution with only the element of a "corrupt intent" separating them from conviction.

Appx62 n.3. This would give § 1346 a "standardless sweep" allowing "'policemen, prosecutors, and juries to pursue their personal predilections,' thereby 'facilitating opportunistic and arbitrary prosecutions.'" *Skilling*, 561 U.S. at 403 (quoting *Kolender v. Lawson*, 461 U.S. 352, 358 (1983)).

The government's application of § 1346 is particularly vague here given *Skilling*'s assurances that a conflict of interest alone is not honest services fraud. The Supreme Court said so in *Skilling* specifically to avoid this type of vagueness problem. 561 U.S. at 403-04, 408 n.42. The Court sought to restore the pre-*McNally* body of honest-services law, so it surveyed those prosecutions and determined that the paradigmatic core of those cases related to bribery and kickbacks. *Id.* at 407-09. "In light of the relative infrequency of conflict-of-interest prosecutions in comparison to bribery and kickback charges … we conclude that a reasonable limiting construction of § 1346 must exclude this amorphous category of cases." *Id.* at 410. Under the same rubric, the government's employment theory of bribery here likewise fails. It does not appear that anything similar

was prosecuted in the pre-*McNally* cases. And the district court acknowledged below that there had never been a case like this, "where a presumedly legal benefit turned into an illegal bribe based upon the recipient being in public office and corresponding with the payor of the benefit." Appx59-60.[11]

The government's efforts to frame this case in bribery terms does nothing to resolve the vagueness concerns raised in *Skilling*. "To this day, no one knows what 'honest-services fraud' encompasses." *Percoco v. United States*, 598 U.S. 319, 333 (2023) (Gorsuch, J., concurring). As Dougherty explained below, the "Government's theory would impermissibly turn every alleged conflict of interest into a bribery case in violation of *Skilling*, while overriding the decision of the Commonwealth of Pennsylvania to permit elected officials to maintain private employment." Appx401. The Court should, accordingly, hold that § 1346 is unconstitutionally vague as applied to Dougherty and vacate his honest services fraud convictions.[12]

---

[11] As discussed elsewhere, Dougherty was not even the payor of the purported benefit—Local 98 was. *See infra* Section II.B.

[12] The Court can also avoid finding § 1346 unconstitutionally vague by instead construing the statute to not cover Dougherty's conduct, as the Supreme Court did in *Skilling*. *See* 561 U.S. at 405 ("It has long been our

**II. The district court should have granted Dougherty's Rule 29 motions because the government did not put on sufficient evidence of honest services fraud.**

**Standard of Review:** The Court reviews sufficiency challenges *de novo*. *United States v. Hoffert*, 949 F.3d 782, 790 (3d Cir. 2020). The question is the same as for a court assessing a Rule 29 motion in the first instance—"whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential element elements of the crime beyond a reasonable doubt." *Id.* (citation omitted). But, to the extent such an argument raised issues of statutory interpretation, this Court exercises plenary review. *United States v. Zavrel*, 384 F.3d 130, 132 (3d Cir. 2004); *United States v. Thayer*, 201 F.3d 214, 219 (3d Cir. 1999).

The district court also should have granted Dougherty's Rule 29 motions, for many of the same reasons raised in the motion to dismiss. Appx3505-41, 4703-39. There was simply insufficient evidence to convict Dougherty of conspiracy or the substantive honest services fraud counts because: (1) the evidence and government's argument showed, at worst, a conflict of interest, not bribery, (2) there was no evidence that

---

practice … before striking a federal statute as impermissibly vague, to consider whether the prescription is amenable to a limiting construction."). Likewise, the vagueness concerns here also implicate the "familiar principle that 'ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity.'" *Id.* at 410 (quoting *Cleveland*, 531 U.S. at 25); *see also Snyder*, 603 U.S. at 20-21 (Gorsuch, J., concurring) (explaining that "lenity is what's at work" behind majority's interpretation of bribery statute). Whether as a matter of constitutional vagueness or statutory interpretation, the Court should vacate Dougherty's honest services fraud conviction.

Dougherty paid or authorized ongoing payments to Henon, (3) the evidence did not show that Dougherty had a corrupt intent before providing the purported stream of benefits, (4) there was no evidence that Dougherty possessed the intent to influence a properly defined "question or matter," consistent with *McDonnell* and *Silver,* and (5) Henon's actions did not constitute "official acts." For all these reasons, this Court should vacate Dougherty's convictions on all the honest services fraud counts.

## A. The government's prosecution was clearly about a conflict of interest, not bribery.

The government's honest services fraud case was insufficient as a matter of law because it was about conflict-of-interest, not bribery. *See* Appx3536-38, 4734-38. The government's overarching theory was that Henon took actions that benefited Local 98 because he was employed there—definitionally, a conflict-of-interest case.

As explained above, the government can no longer base an honest services fraud prosecution on an undisclosed conflict of interest. *See Skilling*, 561 U.S. at 408-09. This Court has distinguished between a conflict of interest—a "public official who receives payments while taking discretionary action that benefits that payor"—and a bribe—which differs in that it requires a "quid pro quo whereby the public official and

60

payor agree that the discretionary action taken by the public official is in exchange for payment." *Panarella,* 277 F.3d at 697.

The government's theory in this case is largely indistinguishable from the conflict-of-interest theory it used to advance pre-*Skilling*. In *Panarella,* a state senator failed to disclose his employment as a business consultant for a private tax collection business, and took actions to obtain state contracts for the business and opposed tax legislation that would have harmed the business. *Id.* at 681. This Court held it did not matter that the government could not (and did not) show any type of *quid pro quo*, because this still violated the honest services fraud statute under a conflict-of-interest theory. *Id.* at 691-97.[13] After *Skilling*, Panarella's conviction was vacated because the conflict-of-interest theory was no longer viable under § 1346. *See United States v. Panarella,* 2011 WL 3273599 (E.D. Pa. Aug. 1, 2011).

The government eschewed the requirement that it establish a *quid*

---

[13] Dougherty's conduct also would not have amounted to an unlawful conflict of interest even under *Panarella,* because Henon's salary was disclosed and there was no violation of state law. *See* 277 F.3d at 694 ("a public official who conceals a financial interest in violation of state criminal law while taking discretionary action that the official knows will directly benefit that interest commits honest services fraud").

*pro quo*, and presented a pure conflict-of-interest theory. *See supra* Sections I.B, I.C. This Court has recognized the "practical difficulties in proving the existence of such a quid pro quo," *Panarella*, 277 F.3d at 697, but those difficulties can no longer be avoided by resorting to conflict-of-interest. Nor can the government simply insist the *quid pro quo* is inherent in the nature of the relationship, as it appeared to do here. If it could, it could transform every conflict-of-interest case into a bribery scheme, rendering the Supreme Court's decision in *Skilling* meaningless.

The government not only failed to distinguish its bribery theory from a conflict-of-interest through evidence of a *quid pro quo*—it explicitly argued a conflict-of-interest theory. In its opening, the government at times outright endorsed the improper theory, asserting that councilmembers can have outside jobs, "[b]ut cannot use their job as a councilperson to benefit their private employer." Appx812. It further asked the jurors to consider, "was Defendant Henon putting Defendant Dougherty, his private employer, first before the public to whom he owed the duty of honest services?" Appx814. And, during closing, the government argued:

> The city, the voters, Henon constituents were entitled to something better. They were entitled to Robert Henon's

undivided loyalty. He was elected to serve them, not him. But that is not what they got. An elected official owes his honest and faithful services to his constituents and to the public. No one else. When an elected official makes a decision or acts in his capacity as an elected official, he needs to act in the best interest of the public only. He is requested to act in the best interest of the public by law. The public is entitled to have their elected officials act solely on their behalf.

Appx4238. It also insisted that conduct by Henon was bribery, "[b]ecause you are no longer giving the public the undivided loyalty that they are owed. You are compromised. The public should not have to guess whose interest you are acting in. The public is entitled to believe that the only constituency Henon serves is them." Appx4254.[14]

It is unequivocally *not* honest services fraud for a public official to have divided loyalties or take discretionary action to benefit a private employer. It is only a crime if the parties agree that actions are in

---

[14] The government's arguments appeared to resonate with at least one juror, who suggested that these convictions may have been based on a perceived conflict of interest. *See* Appx4712-13.

> The juror said members of Council should not be allowed to hold second jobs. "There's always going to be a conflict of interest, even if the conflict of interest is only an issue of time," the juror said. "I think the people of Philadelphia are getting shortchanged way too much by Council people who have other jobs."

Oona Goodin-Smith and Jeremy Roebuck, *A Juror in the Dougherty-Henon trial says it was a lesson in Philly government—'and it was appalling,'* Philadelphia Inquirer (Nov. 16, 2021).

exchange for a benefit. This is an issue of statutory interpretation, subject to plenary review, *see Zavrel*, 384 F.3d at 132 (3d Cir. 2004), and because the government relied on an improper conflict-of-interest theory, Dougherty's conviction fails as a matter of law and should be vacated with an order for judgment of acquittal. *Cf. United States v. Washington*, 79 F.4th 320, 326 (3d Cir. 2023) (vacating conviction where government's theory was inconsistent with the statute as a matter of law).

## B. Dougherty did not authorize Henon's ongoing employment at Local 98.

The government also failed to put on sufficient evidence that Dougherty, specifically, paid or authorized payment of a bribe to Henon. Dougherty raised this issue first in his motion to dismiss below, *see* Appx402-06, arguing that the Indictment did not make clear how the government intended to hold Dougherty responsible for Henon's ongoing employment and paycheck from Local 98. At trial, the reason became clear. The evidence did not show Dougherty made that decision, and, in fact, it specifically showed otherwise. *See* Appx3514-15, 4731-34.

A key element of bribery is that the "*payor provided a benefit to a public official* intending that he will take favorable official acts that he would not otherwise take." *Wright*, 665 F.3d at 568 (emphasis added).

Indeed, the "critical event in the commission of the crime is the actual giving or the offer to give or transfer money or other thing of value, absent which no offense is committed under the statute." *United States v. O'Donnell*, 510 F.2d 1190, 1194 (6th Cir. 1975). Even in a conspiracy case, "a defendant's guilt must always remain 'individual and personal'" because "conspiracy jurisprudence does not sanction guilt by association." *United States v. Tyson*, 653 F.3d 192, 206, 211 (3d Cir. 2011). It is a "fundamental principle that an individual may not be convicted on the basis of another person's acts which he neither authorized nor adopted." *United States v. Cryan*, 490 F. Supp. 1234, 1242 (D.N.J. 1980); *see also Lady J. Lingerie, Inc. v. City of Jacksonville*, 176 F.3d 1358, 1367 (11th Cir. 1999) ("due process prohibits the state from imprisoning a person without proof of some form of personal blameworthiness more than a 'responsible relations'").

As with much of the government's case, its failure to identify a clear *quid pro quo* agreement makes it difficult to pin down exactly what it believes constituted payment by Dougherty. The Indictment alleged: "*Local 98* paid ROBERT HENON a salary during the time he served as a City Councilman," and the identified tickets "were paid for by *Local 98*,"

Appx339-40 (emphasis added), but also that *Dougherty* "provided [Henon] with a stream of personal benefits[.]" Appx339. It was unclear how Dougherty should be personally responsible for Local 98's payments to Henon. The government claimed that there was sufficient evidence that "Dougherty decided to keep Henon on the payroll after he was elected to City Council in November 2011, and that he was the person who kept Henon on the Local 98 payroll during 2015 and 2016." Appx4763-64. But, as discussed elsewhere, the government repeatedly disclaimed any theory that the decision to retain Henon in 2011 was part of this bribery scheme. *See* Appx3639, 4251. Moreover, the parties stipulated that Dougherty had the authority to hire employees at Local 98, *see* Appx4764, but not that he specifically authorized the hiring or retention of Henon, *see* Appx4731. To the contrary, Local 98's bookkeeper, Don Judge, testified that he was directed by Local 98 president, Brian Burrows, not Dougherty, to continue Henon's paychecks on a reduced basis in 2012 after his election to City Council. *See* Appx2115-18, 2140-41.

The government's focus on actions between 2015 and 2016 left it on even weaker ground. While the government suggested that Dougherty

made the retention decision in 2011, it in no way asserted, let alone proved, that he made any decision as to Henon's employment or payment between 2015 and 2016. Indeed, it does not appear that any decisions were made at all about Henon's employment after 2012. *See* Appx4810. Rather, the government suggested that Henon's previous salary simply transformed into a bribery scheme around May 2015. But it offered no evidence that Dougherty did anything with respect to payments to Henon at that time. It could not just rely on Henon's ongoing salary, because that was fulfilled by direct deposit and had nothing whatsoever to do with Dougherty. *See* Appx2169-71, 3517-18. Moreover, Henon had been lawfully receiving the salary for years and he was "entitled" to it, so it could not be a bribe. *See United States v. Reichberg*, 5 F.4th 233, 247 (2d Cir. 2021) (public official must receive "payment to which he was not entitled").

Similarly, the government failed to put on any evidence about Dougherty's responsibility for the individual honest services fraud counts. *See* Appx3538-40. Counts 98 through 109 detailed the purported wires and mailings related to the honest services fraud, but only one even mentions Dougherty's name. *See* Appx359-62. The others describe things

like Henon's receipt of his direct deposit paycheck, e-mails between Henon's staff, phone calls with other parties, or a mailing from L&I. But wire fraud fundamentally criminalizes transmitting or causing to be transmitted wires in furtherance of an underlying scheme. *See* 18 U.S.C. § 1343. There was no evidence presented that Dougherty had any part in these transmissions, or that he "knew that the wire would be used in the ordinary course of business or should reasonably have foreseen such use." *United States v. Bentz*, 21 F.3d 37, 41 (3d Cir. 1994).

Because the evidence showed that Dougherty neither paid nor authorized any payments, no rational jury could have found him guilty of bribery, and his conviction should be vacated with an order for judgment of acquittal. *See Hoffert*, 949 F.3d at 790.

### C. The evidence did not show that Dougherty entered into a corrupt agreement with Henon at the beginning of the purported stream of benefits.

The government also failed to offer any proof that Dougherty and Henon entered into a corrupt agreement. *See* Appx3511-19, 4716-4727, 4812-18. Here again, the critical component was the timing of the purported *quid pro quo*. *See supra* Section I.B.1. The government was required to prove that Dougherty and Henon entered into a corrupt

68

agreement—as both a matter of conspiracy law and the elements of honest services fraud—during the charged period from May 2015 through September 2016. But it could not do so, because the identified *quid*—Henon's ongoing employment with Local 98—was decided long before any corrupt intent allegedly existed.

Any agreement as to Henon's ongoing employment by Local 98 was made in 2011 or 2012. As early as December 13, 2011, the decision was made that Henon would continue to "play a role in [Local 98's] union operation and will collect a check from Local 98," after he began on City Council. Appx4726-27. Indeed, the trial made clear the government believed the *quid* was Henon's ongoing employment, which was decided in 2011. *See* Appx3514-15; *see also* Appx424 ("After Henon was elected to city council in 2011, Dougherty kept him on the payroll …"), 4316 ("Dougherty was responsible for Henon's staying on Local 98's payroll after Henon was elected in November of 2011."). That was also the district court's understanding of the *quid*. Appx70 ("Allegedly, Dougherty, through Local 98, authorized Henon's Local 98 salary while Henon was a Philadelphia City Councilmember 'in return for Henon's performance of official acts, in essence, any action Dougherty wanted to

further his interests.'" (citations omitted)).

The employment decision is the only coherent timing for the purported corrupt agreement in a case where ongoing employment benefits are the purported bribe. *See, e.g., Bryant*, 655 F.3d at 242 ("reasonable jury could conclude that Gallagher offered Bryant his position at SOM in exchange for his official actions …"); *United States v. Urciuoli*, 613 F.3d 11, 13 (1st Cir. 2010) ("The gravamen of the charge against Urciuoli was his role in a scheme to bribe—in the guise of an employment contract—John Celona, then a Rhode Island state senator."). It was also the only possible affirmative action the government alleged Dougherty or Local 98 took with respect to Henon's employment. *See* Appx4810.

But the 2011 employment decision could not support the government's charged scheme.[15] First, it would not fall within the timeframe charged by the government (May 2015 to September 2016). The government needed to prove the *quid* occurred and the conspiracy agreement was formed during that time. *See United States v. Conley*, 37

---

[15] Again, it was not Dougherty who paid this or made the employment decision. *See supra* Section II.B.

F.3d 970, 976 (3d Cir. 1993) (to prove conspiracy, agreement must have been "formed, reached, or entered into by two or more persons ..."); *United States v. Marino*, 562 F.2d 941, 944 (5th Cir. 1977) (describing element as "conspiracy described in the indictment was formed and in existence during the time alleged"); *United States v. Traitz*, 2002 WL 31681967, at *2 (E.D. Pa. Nov. 26, 2002) ("It is sufficient if you find beyond a reasonable doubt that, in fact, a conspiracy was formed and existed continuously between the dates reasonably near those alleged in the indictment ...").

Second, the government never alleged, let alone proved, that Dougherty or Henon had in mind some potential official action at the time Local 98 decided to retain Henon as an employee. *See* Appx4723-24. And, third, the government expressly disclaimed any such theory, clarifying the "indictment does not charge that a conspiracy to commit honest services wire fraud began in 2012, as the government did not possess evidence to prove that." Appx4748. When asked if the government was suggesting the bribery agreement began in 2012, the government responded: "No your honor, we are not suggesting anything, nobody knows. In other words, nobody knows whether it did or didn't." Appx3639.

Indeed, the government told the jury "[t]here basically has been no evidence presented about what happened before" May 2015 through September 2016. Appx4251. But evidence *had* been introduced about 2011; it just doomed the government's case. *See* Appx4726.

The government insisted that it only needed to prove that Henon received a stream of benefits between 2015 and 2016, and, in exchange, performed a series of official acts—not that there was a preexisting *quid pro quo* agreement. *See* Appx4747-57. It focused on the weekly salary payments, arguing that "Dougherty repeatedly paid Henon, and during the period he was being paid Henon repeatedly agreed to take official acts on Dougherty's behalf." Appx4752. But it provided no evidence that Dougherty ever had anything to do with Henon's direct-deposited salary, such that he could have either paid it as a bribe, or had the accompanying intent. *See supra* Section II.B. This is not "the 'stream of benefits' theory that the Third Circuit has endorsed," as the government claimed. Appx4752. Rather, stream of benefits cases involve a pre-existing agreement that the ongoing benefits will be in exchange for official action, concurrent with the payment of or agreement to pay a stream of bribes. *See supra* Section I.B.1. And, when ongoing employment is the stream of

benefits, that *quid pro quo* is uniformly found at the time the employment relationship is established. *See, e.g., Bryant*, 655 F.3d at 240-43.

The government's theory was, therefore, a moving target. It claimed no need to show a *quid pro quo* as to any specific official act, but also claimed no need to show a *quid pro quo* as to the overarching stream of benefits conspiracy. In both conspiracy and bribery law, the essential element is an agreement. *See Iannelli v. United States*, 420 U.S. 770, 777 (1975) ("Conspiracy is an inchoate offense, the essence of which is an agreement to commit an unlawful act."); *Evans*, 504 U.S. at 268 ("the offense is completed at the time when the public official receives a payment in return for his agreement to perform specific official acts"). The government needed to prove that a *quid pro quo* agreement here was *formed* at some time. But, in the end, it simply describes a series of parallel actions, not a stream of benefits stemming from a *quid pro quo*. *See Silver*, 948 F.3d at 577 (holding it is not a crime to accept a thing of value and then perform an act to benefit the payor, rather, the government must show "at the time the official accepted the payment," he or she understood it was a payment for official influence on specific question).

There is also no support in the law for the government's theory that a lawful employment arrangement can transform into an unlawful bribery scheme without some intervening action by the payor. As explained below, the *quid* here was Henon's employment which was given to him in 2011—and you "cannot bribe someone with something to which they are already entitled." Appx3586. The government argued that Henon was not entitled to his ongoing salary and that Dougherty could have terminated him at any time. *See* Appx4756-58. But the government identified no bribery case, stream of benefits or otherwise, where a person's failure to terminate somebody else's employment constituted a series of bribes. *See* Appx59-60 (court acknowledging government identified no case where a "legal benefit turned into an illegal bribe based upon the recipient being in public office and corresponding with the payor"). If, as the government made clear, the 2011 retention decision was not the *quid pro quo*, it was required to identify some time thereafter where Dougherty agreed to pay or paid something to Henon, with the corrupt intent that the payment influence official actions. It failed to do so.

The government's theory was inconsistent with honest services

74

fraud as a matter of law, and so this Court should vacate the convictions with an order for judgment of acquittal. *See Washington*, 79 F.4th at 326. Likewise, because the government failed to put on any evidence of a corrupt agreement preceding the stream of benefits, no rational jury could have found Dougherty guilty of bribery, and his conviction should be vacated. *See Hoffert*, 949 F.3d at 790.

> **D. The government did not prove that Dougherty possessed the intent to influence a properly defined question or matter, as required by *McDonnell*.**

As discussed above, *see supra* Section I.B.2, *McDonnell* altered the intent requirement in a stream-of-benefits theory. *See also* Appx3519-27, 4727-31. The jury must "determine whether the public official agreed to perform an 'official act' at the time of the alleged *quid pro quo*." *McDonnell*, 579 U.S. at 572-73. The government, therefore, had to show more than a retainer for unspecified services at the time of the *quid pro quo*—it had to prove beyond a reasonable doubt that Dougherty had an intent to influence a "properly defined" "question or matter." *See supra* Section I.B.2 (citing *Silver*, 948 F.3d 538).

The government clearly failed to do so. It disclaimed any *quid pro quo* at all at the time of Henon's 2011 extended employment, let alone a

specific intent to influence "questions or matters" nobody could have possibly been aware of, such as CHOP's future installation of MRI machines, a towing resolution, or the plumbing code legislation. *See* Appx4731. And the government did not assert any intent on Dougherty's part as to such a properly defined question at the time of Henon's receipt of any paycheck in 2015 or 2016, or at some unidentified time constituting the agreement for a stream of benefits.

Instead, the government relied on a vague theory that Henon was "on retainer, on call, to do what Defendant Dougherty wants[.]" Appx808. In its closing, the government similarly advanced a nonspecific retainer theory. *See* Appx4238 ("Dougherty bought Henon so Henon would do what Dougherty wanted him to do in his role as a member of city council."), 4241 ("In return, Henon was willing and able to do whatever John Dougherty wanted him to do, as the need arose …" and "John Dougherty kept Robert Henon on retainer by paying a weekly salary … so whenever Dougherty need something, Henon was there to do whatever Dougherty wanted."), 4252 (arguing Dougherty was paying for Henon to do "anything John Dougherty wanted him to").[16]

---

[16] To be clear, Dougherty does not agree that such a retainer

This is no longer a viable honest-services fraud theory because it is nothing more than an agreement to "take—as the opportunities arise—'*any* decision or action on any question, matter, cause, suit, proceeding or controversy,'" which is "so vague as to be meaningless." *Silver*, 948 F.3d at 556; *see also Hills*, 27 F.4th at 1179 (noting that *Silver* and *McDonnell* invalidated "retainer" theories); *Madigan*, 2026 WL 1133645, at *3 (agreeing with *Silver* holding); *cf. McDonnell*, 579 U.S. at 574-75 (cautioning against the "government's view," that "nearly anything a public official accepts … counts as a *quid*; and nearly anything a public official does … counts as a *quo*").

The district court and government misinterpreted *Silver* and the honest services fraud statute, as a matter of law, to still allow for an improper retainer theory. This Court should, therefore, vacate the convictions with an order for judgment of acquittal. *See Washington*, 79 F.4th at 326. And because the government failed to put on any evidence that Dougherty and Henon agreed upon a "question or matter" at the time of the *quid pro quo,* no rational jury could have found Dougherty

agreement even existed, nor that the government put on any evidence of such a *quid pro quo*. But, even if it had, it would no longer be a viable theory of honest services fraud after *McDonnell*.

77

guilty of bribery, and his conviction should be vacated with an order for judgment of acquittal. *See Hoffert*, 949 F.3d at 790.

### E. None of Henon's identified conduct constituted "official action."

Finally, the evidence was insufficient to convict Dougherty of honest services fraud because none of the acts Henon allegedly took in exchange for payment constituted "official acts" under the law.

*McDonnell* "narrowed the conduct that would constitute 'an official act,'" for bribery law. *United States v. Allinson*, 27 F.4th 913, 920 (3d Cir. 2022). First, the government "must identify a 'question, matter, cause, suit, proceeding or controversy' that 'may at any time be pending' or 'may by law be brought' before a public official." *McDonnell*, 579 U.S. at 567. "This first step is divided into two sub-components." *United States v. Fattah*, 914 F.3d 112, 152 (3d Cir. 2019). At "Step 1(A), the Government must 'identify a 'question, matter, cause, suit, proceeding or controversy,''" which "must be a 'formal exercise of governmental power that is similar in nature to a lawsuit before a court, a determination before an agency, or a hearing before a committee.'" *Id.* at 152-53 (quoting *McDonnell*, 579 U.S. at 567, 574).

Step 1(B) requires that the "qualifying 'question, matter, cause,

suit, proceeding or controversy' was one that 'may at any time be pending' or 'may by law be brought' before a public official." *Id*. at 153 (quoting *McDonnell*, 579 U.S. at 567). The "question or matter" must be "something specific and focused" and "'something that is relatively circumscribed—the kind of thing that can be put on an agenda, tracked for progress, and then checked off as complete." *United States v. Repak*, 852 F.3d 230, 252 (3d Cir. 2017) (quoting *McDonnell*, 579 U.S. at 570). "By contrast, matters described at a high level of generality—for example, 'economic development,' 'justice,' and 'national security'—are not sufficiently 'focused and concrete.'" *Fattah*, 914 F.3d at 153 (quoting *McDonnell*, 579 U.S. at 570).

Second, the government must prove the "public official made a decision or took an action 'on' that question, matter, cause, suit, proceeding, or controversy, or agreed to do so." *McDonnell*, 579 U.S. at 567. "That decision or action may include using his official position to exert pressure on another official to perform an 'official act,' or to advise another official, knowing or intending that such advice will form the basis for an 'official act' by another official." *Id*. at 574. But "[s]etting up a meeting, talking to another official, or organizing an event (or agreeing

79

to do so)—without more—does not fit that definition of 'official act.'" *Id*.

### 1. L&I / CHOP

The government argued that, in July 2015, Dougherty learned of a non-union company installing an MRI machine at CHOP and attempted to frustrate the installation. Appx3560-64. On July 20, 2015, Local 98's safety coordinator, James Dollard, contacted Licenses and Inspections ("L&I"), and the next day, L&I inspector Peter DeLisi issued violations and a stop work order. *See* Appx3528, 3596-97.[17] The CHOP project manager ignored the stop work order and completed the installation. Appx3528. In August 2015, a Local 98 business agent complained to Henon about ongoing improper electrical work at CHOP, and Henon thereafter reported the issue to then-L&I Commissioner, Carlton Williams. Appx3529.

These were not official acts under *McDonnell*. It is not even clear what the "specific and focused" "question or matter" would be. *See*

---

[17] Dougherty was acquitted of the July 2015 L&I conduct, so this brief does not focus on the issue. This appears to be the basis for the jury's verdict of not guilty on Counts Three and Eleven of the Verdict Sheet—Counts 99 and 109 of the Indictment. *See* Appx359, 362, 4699-4700. The district court expressed the same understanding of each substantive count—that they were proxies for certain official acts—when it granted Dougherty's Rule 29 motion as to the PPA audit conduct. *See* Appx64.

*McDonnell*, 579 U.S. at 570. And, in any event, Henon's conduct did not constitute a "decision or action" on any such matter, as the Supreme Court has already said "calling another public official" is not enough. *Id.* at 567. The government put on no evidence that Henon did anything other than pass a complaint along to L&I. *See* Appx3529, 3597. It introduced no evidence that Henon "exert[ed] pressure," or "advise[d] another official," *see McDonnell*, 579 U.S. at 574, and, in fact, the evidence showed the opposite, *see* Appx1502-10 (Carlton Williams testifying that he received many L&I complaints, including from city councilmembers, and that Henon did not ask him to do anything inappropriate), 4364-65, 4402-04.

This is precisely the type of conduct that *McDonnell* warned against criminalizing. *See* 579 U.S. at 575 ("The basic compact underlying representative government *assumes* that public officials will hear from their constituents and act appropriately on their concerns"). Henon's job required him to pass along complaints to L&I, which would certainly apply to legitimate complaints where licensure accusations turned out to be accurate. *See* Appx1119-24, 1136-44, 1375-77, 3529, 3715-27 (describing licensure and insurance requirements in Philadelphia, and

Local 98 efforts to ensure compliance), 3731-38. "Unlike most conduct typically the subject of the case law, urging local officials to obey state law is not easily described as a deprivation of honest services[.]" *United States v. Urciuoli*, 513 F.3d 290, 295 (1st Cir. 2008). It is also, therefore, impossible to show that Dougherty intended that Henon would take some action he "would not otherwise take," if not for a purported bribe. *See Wright*, 665 F.3d at 568. And this type of charge risks criminalizing Dougherty's constitutionally protected right to petition the government. "The right to petition the government is 'one of the 'most precious of the liberties safeguards by the Bill of Rights.'" *Mirabella v. Villard*, 853 F.3d 641, 653 (3d Cir. 2017) (quoting *BE & K Constr. Co. v. NLRB*, 536 U.S. 516, 524 (2002)).[18]

### 2. Plumbing Code

The government's next purported "official act" related to the plumbing code. According to the government, in August 2015, Henon

---

[18] Such a theory would also require a heightened burden of proof. *See* Appx3529 n.5. Other bribery theories that implicate constitutional rights—like the First Amendment in the campaign contribution context—require the government to show an *explicit*, rather than implicit, *quid pro quo. See McCormick v. United States*, 500 U.S. 257, 273 (1991)).

sought Dougherty's advice about potential Plumbing Code legislation, which was opposed by the plumbers' unions and which he was considering introducing and holding until Mayor Kenney entered office in January 2016. Appx3567-69, 4782-84. Dougherty agreed with Henon's proposed plan, advising him to "do it," which the government argued would be done to help Dougherty gain leverage with the unions in an election for Business Manager of the Business Trades. Appx3567-69, 4782-84.

This was not an official act because Dougherty did not direct or ask for anything at all—Henon contacted Dougherty and Dougherty provided advice. *See* Appx3530-31, 4367. This was the same reason the district court dismissed the PPA audit counts against Dougherty. *See* Appx64. This could not have been a question or matter that was contemplated by Dougherty as reciprocity for some payment, because *Henon* called him. *Cf. Reichberg*, 5 F.4th at 247 (payor must understand that "the public official was expected, as a result of the payment to … exercise particular kinds of influence as specific opportunities arose" (citation omitted)). Further, it means that Dougherty could not have had the requisite intent to influence Henon to "take favorable official acts that he *would not*

83

*otherwise take.*" *Wright*, 665 F.3d at 568 (emphasis added). It may well be that Dougherty had his own reasons for wanting Henon to propose and delay the plumbing code. But it is simply not a bribe for Henon to have himself considered engaging in some action, with which Dougherty agreed.

Moreover, Henon did not actually take any action on the plumbing code—the government offered no evidence that he ever introduced or delayed any such legislation. *See* Appx3531, 4367; DE 253 at 13 (Henon Rule 29 motion). The government did not dispute this below, but asserted it only needed to show that Henon *agreed* to perform the official act, not that he performed it. *See* Appx4784-85. As this Court has explained, the "public official need not even perform the official acts if he stood ready to do so having intended to accept a bribe." *Wright*, 665 F.3d at 568. But, here, the government invoked the stream-of-benefits theory to disclaim any requirement that it show this kind of intent. And in the stream-of-benefits context, the government must "present evidence that shows *a course of conduct* of favors and gifts flowing to a public official in exchange for a *pattern of official actions* favorable to the donor." *Bryant*, 655 F.3d at 241. The whole point of a stream-of-benefits theory is that each *quid*

need not be connected to each *quo*, but the exchange is understood by the pattern of actions taken. *See generally Kemp*, 500 F.3d at 281-82; *see also United States v. McCabe*, 103 F.4th 259, 284 (4th Cir. 2024) ("the underlying acts of bribery can be established 'through an ongoing course of conduct, so long as the evidence shows that the favors and gifts flowing to a public official are in exchange for a pattern of official actions favorable to the donor'" (citation omitted)). If the official action was never actually performed, it could not be part of the pattern of official actions the government needed to prove its stream-of-benefits theory.

### 3. Comcast Franchise Agreement

The government also argued that Henon performed one or more official acts on Dougherty's behalf with respect to the City of Philadelphia's 2015 negotiations with Comcast for a Franchise Agreement. Appx3570-72. It failed to prove it.

The government's theory was, fundamentally, that Dougherty wanted an agreement from Comcast that would benefit labor unions, and that he used his relationship with Henon to get in the room with Comcast. Appx3571. Of course, Henon setting up two meetings involving Dougherty and leadership from Comcast is definitionally *not* an official

act. *See McDonnell*, 579 U.S. at 567 ("setting up a meeting" is not an official act); *Fattah*, 914 F.3d at 154. And the proposed side-agreement with Comcast—which was never memorialized, Appx75—could not be the official act, because it would have been action by Comcast and/or Dougherty, not Henon. *See McDonnell*, 579 U.S. at 574 (the question "must involve a formal exercise of *governmental* power," and to "qualify as an 'official act,' *the public official* must make a decision or take an action" (emphasis added)).

Otherwise, it is unclear what the government believed Henon's "official acts" were with respect to the Comcast negotiation. *See* Appx3570-71, 4785-59. Voting the Franchise Agreement out of committee and ultimately voting in favor of it could not possibly be the official action—the government did not even argue that those actions were taken on behalf of Dougherty. *See* Appx3599-3600, 3645-46. Nor could Henon's December 2 call for a recess constitute an "official act." That is a purely ministerial act. Insofar as the Comcast Franchise Agreement would be the "question or matter," a brief recess is not a "decision" or "action" at all. *See McDonnell*, 579 U.S. at 567.

### 4. Soda Tax

The government also alleged two official acts by Henon with respect to a proposed Philadelphia soda tax: (1) the May 2015 decision to work with an advertising agency to promote the soda tax ("Soda Tax #1"),[19] and (2) his June 2016 decision to vote for the soda tax ("Soda Tax #2"). Appx3532. The government argued that Henon was undecided about the soda tax in early 2016, but that Dougherty wanted him to vote for it because it would be a major achievement for Dougherty's friend, Mayor Kenney. Appx4791-92.

There was no evidence showing Henon voted for the soda tax in 2016 at Dougherty's behest. As Henon pointed out below, "Not one witness testified at trial that Robert Henon supported the Soda Tax and voted for it because of the teamsters or because of John Dougherty." DE 253 at 18. Henon had been working on the soda tax with Mayor Nutter, even before Soda Tax # 1 in May 2015. *See* Appx3816-19, 3995-97, 4116-

---

[19] As with the July 2015 L&I conduct, *see supra* Section II.E.1, the jury's not guilty verdict on Counts Two and Three of the Verdict Sheet— Counts 98 and 99 of the Indictment—was an acquittal on the Soda Tax #1 charges. *See* Appx359, 4699. The government appears to share this understanding. *See* Appx4790 ("the jury acquitted on the substantive charge related to that allegation").

20, 4406-07. Indeed, Dougherty's conviction on the Soda Tax #2 count is difficult to reconcile with his acquittal on the Soda Tax #1 count.[20] But, by the time of Soda Tax # 2, the issue was being pushed by Mayor Kenney who lobbied Henon for his support. Appx3533. So, the government could not and did not prove that Henon's vote was an action he "would not otherwise take" if not for purported bribes. *See Wright*, 665 F.3d at 568. Nor could the government show the requisite intent by Dougherty as to this purported act. The Kenney administration engaged Dougherty to help ensure labor's support for the passage of the tax, much like it engaged Henon to ensure City Council's support. *See* Appx3534, 4359. The tax, therefore, could not have been something that Dougherty corruptly sought in exchange for Henon's salary. This was not a bribe— it was ordinary politics. *See* 4360-61.

The government argued below that the "would not otherwise take" language from *Wright* applies only to the *payor*'s intent, not to the public official's actions. *See* Appx3575-76. It relied primarily on a district court opinion for that reading. *See* Appx3576 (citing *United States v. Bryant*,

---

[20] Henon's counsel called it "[i]nexplicabl[e]" that the jury acquitted the defendants on Soda Tax # 1, while convicting on Soda Tax #2. *See* DE 253 at 17.

556 F. Supp. 2d 378, 392-93 (D.N.J. 2008)); *see also Menendez*, 291 F. Sup. 3d at 619-20. But, on appeal in *Bryant*, this Court did not meaningfully address the issue, and instead only clarified that the fact that the public official's actions "may also have benefited his constituents is irrelevant." 655 F.3d at 242. It is true that the public official need not actually perform any official act so long as he agreed to do so. *See* Appx3576 (citing *United States v. Ozcelik*, 527 F.3d 88, 95 (3d Cir. 2008)). But that is fundamentally different from recognizing a bribe where the public official's only purported *quo* is something they were always going to do. This Court should clarify that question. Especially in stream-of-benefit cases, where the government need not tie specific official acts to specific bribes, the official act should, at the very least, be one that the public official was specifically performing for the purported payor, and not an action he would have otherwise performed.

But, in this case, the distinction the government draws is likely one without a difference. In most instances, if Henon was already going to perform certain actions regardless of any purported bribe, Dougherty could not have had the requisite intent to induce action Henon would not have otherwise taken. *See Wright*, 665 F.3d at 568. That is certainly true

with respect to Soda Tax # 2, which took place at a time when Henon was already committed to supporting the tax.

### 5. Towing

The government also argued that, after Dougherty almost had his car towed in September 2015, Henon directed an intern in his office to visit and photograph the towing company and draft a resolution for hearings on its practices. *See* Appx3535-36, 3578, 4794-98.

This was not an official act. Henon did not make a decision or take an action on a question or matter. *See McDonnell*, 579 U.S. at 567. He asked an intern to draft something that was ultimately never proposed. Indeed, Henon did not end up introducing legislation—another councilmember did. *See* Appx833, 2492-94, 4115, 4271-72, 4366. And even if the intern's work could constitute official action, it certainly was not done at Dougherty's direction. Henon had already been investigating the same towing agency since his car was towed by them in June 2015, and he learned in August that the Philadelphia DA's office was investigating it. *See* Appx2460-66, 4106-14, 4404-06.

This theory also presents many of the same concerns as the L&I issue above. What the towing company did to Dougherty was "a violation

of Philadelphia law." Appx4366. So, reporting that violation to Henon could hardly constitute a deprivation of honest services. *See Urciuoli*, 513 F.3d at 295. Prosecuting on these grounds also risks infringing on Dougherty's constitutional right to petition the government. *See supra* n.18. And, as noted above, because Henon was already looking at the towing issue, Dougherty could not have intended to induce action that Henon would not have otherwise taken. *See Wright*, 665 F.3d at 658.

### III. The district court's jury instructions for the honest services fraud trial included several misstatements of law that merit vacating Dougherty's convictions.

**Standard of Review:** This Court reviews "*de novo* 'whether the jury instructions stated the proper legal standard.'" *United States v. Steiner*, 847 F.3d 103, 114 (3d Cir. 2017) (citation omitted). The "refusal to give a particular instruction" and the "wording of instructions" are reviewed for abuse of discretion. *Id*. This Court reviews jury instructions to determine whether, "taken as a whole, they properly apprized the jury of the issues and the applicable law." *United States v. Yeaman*, 194 F.3d 442, 452 (3d Cir. 1999) (citation omitted).

The district court also erred in the honest services fraud trial by giving jury instructions that misstated the law and minimized the government's burden of proof. The court erred by: (1) denying the *quid pro quo* instruction on a "specific and focused question or matter" to comply with *McDonnell* and *Silver*, (2) giving a non-Model mixed motive instruction, and (3) modifying the "official act" instruction in a way that

91

relieved the government of its burden to prove the element. These errors

merit vacating Dougherty's convictions on all the honest services fraud

counts, including conspiracy.

### A. The district court erroneously denied Dougherty's requested *quid pro quo* instruction to comply with *McDonnell* and *Silver*.

Dougherty requested a jury instruction that would reflect the

specific intent requirement for a stream-of-benefits theory of bribery

following *McDonnell* as articulated by the Second Circuit in *Silver*. *See*

Appx633-34. The requested instruction stated, *inter alia*:

> To establish the *quo*, the government must prove beyond a reasonable doubt that at the time the alleged item of value is given, Robert Henon agreed to take an official action on an issue that was properly defined—*i.e.*, focused, concrete and specific, question, matter, cause, suit or controversy. A promise to perform some act or to "benefit the payor," without more, is not sufficient to establish a *quid pro quo.*
> …
> In other words, the government must prove that at some point, John Dougherty and Robert Henon agreed that something of value, namely employment by Local 98 and sporting tickets, would be provided in exchange for the future performance of an official action on a particular and focused question, matter, cause, suit, proceeding or controversy, and at the point in time in which the agreement was formed, both John Dougherty and Robert Henon possessed the relevant intent. Furthermore, at the time of the agreement, the particular question, matter, cause, suit, proceeding or controversy to be influenced must have been identified even if the specific official act was not.

Appx633-34; *see also* Appx635. Dougherty also objected to the government's contrary instructions that a stream of benefits could be provided for official actions on an "as needed" basis. *See* Appx717-19, 4192-96, 4474-75.

The district court did not give Dougherty's requested instruction. Instead, it instructed, *inter alia*, that:

> The government must prove that John Dougherty intended to influence official action, and in return Robert Henon understood that Dougherty wanted him to take official action that would benefit Dougherty. In other words, not every payment to a public official is a bribe. A payment made or a thing given in a general attempt to build good will with a public official, without more, does not constitute a bribe. What distinguishes a bribe from other things that would not constitute a violation is that a bribe is offered or accepted with the intent to influence or be influenced in official action. Therefore, the government must prove beyond a reasonable doubt that the defendants had the specific intent to enter into a *quid pro quo* or a stream of benefits agreement.
>
> For Defendant Dougherty, that means he provided things of value to Defendant Henon, intending Henon to take official favorable action that he might not otherwise take.
>
> For Defendant Henon, that means he accepted the things of value, knowing that Dougherty intended to influence him into taking official action, whether he would take the same action or not.

Appx4534-35. It, therefore, instructed on the stream of benefits theory, without clarifying that a specific and focused "question or matter" must

have been contemplated at the time of the payment. *See* Appx4533-34, 4659-61.

That was error. Even if the stream-of-benefits theory survived *McDonnell*, this type of unfocused, retainer theory did not. *See supra* Sections I.B.2, II.D. As in *Silver*,

> the jury instructions were erroneous because the required *quid pro quo* contained therein was too open-ended. The instructions failed to convey that [Dougherty] could not be convicted of honest services fraud unless the Government proved that, at the time the bribe was accepted, [Henon] promised to take official action on a *specific and focused question or matter* as the opportunities to take such action arose.

948 F.3d at 569; *see also United States v. Skelos*, 988 F.3d 645, 656 (2d Cir. 2021) (instruction "left open the possibility that the jury could convict even if [the defendant] was expected to take official action on *any* question or matter in return for the payment."); *see contra Madigan*, 2026 WL 1133645, at *3 (affirming where jury was instructed to convict "only if it found that [defendant] agreed—at the moment he joined the scheme—to take an official act on a specific question or matter"). The court made no such requirement of the government and, as discussed above, the government could not prove that any *quid pro quo* agreement was formed with intent as to a focused "question or matter."

### B. The district court erred by giving a non-Model mixed motive instruction that misstated the law for honest services fraud.

The district court also erred when it gave what it called a "mixed motive" instruction. *See* Appx4535-36 (instruction); *see also* Appx718 (government's proposed instruction), Appx4187-88 (defense objection to proposed instruction), 4201-10, 4228-34 (argument on proposed instruction). The court instructed the jury that:

> Bribery, mixed motive. You may find that a public official has engaged in a bribery or a kickback scheme even though the public official could have lawfully taken the official action that was part of the agreement. Moreover, a public official can have the intent to be influenced by a payment or a valuable thing received, even if ultimately the official ends up taking the same action that he likely would have taken if he did [not][21] receive such payments. You are not required to find that the bribe was the sole reason for the public official's actions.

> Because people rarely act for a single purpose, the bribe payor need not have offered or provided the thing of value only in exchange for official action, and the public official need not have solicited or accepted a thing of value, only in exchange for the performance of official action.

> You may find the defendants guilty even if there were other reasons for their actions. If you find beyond a reasonable doubt that the pair offered or provided a thing of value in exchange for the performance of official action, then it makes

---

[21]  It is not clear if the court omitted the word "not," which had been requested by the government, *see* Appx718, or if this was a transcription error.

no difference that the payor may have also had some other lawful motive for providing a thing of value. Likewise, if you find beyond a reasonable doubt that a public official solicited or received a thing of value in exchange for the performance of official action, then it makes no difference that the public official may also have had another lawful motive for soliciting or accepting a thing of value.

Appx4535-36.

The non-Model instruction was requested by the government, *see* Appx718, who asserted it came from a "dual purpose" instruction this Court approved of in *United States v. Bryant. See* Appx4207 (citing *Bryant*, 655 F.3d at 245-46). In *Bryant*, the Court upheld an instruction that said: "You may find that any salary and other financial benefits accepted by Wayne Bryant was a bribe even if you also find it was paid, in part, for legitimate work if it was also paid, in part, in return for Wayne Bryant's official action." 655 F.3d at 246. As the Court explained, that language remains consistent with *Skilling*, and an alternative theory would mean a "payor could bribe an official with impunity, intending to influence official action and vice versa, provided that the payor had some additional hope, however small, of receiving legitimate work in return." *Id.*

The "mixed motive" instruction, however, was not the same as the

one given in *Bryant* and misstated the law. The instruction was really argument, rather than a statement of Third Circuit law. *See* Appx4187; *see also United States v. MacInnes*, 23 F. Supp. 3d 536, 550 (E.D. Pa. 2014) ("Where the proposed instruction is in effect argument, or is 'essentially a recounting of the facts as seen through the rose-colored glasses of [the requesting party] …,' then the instruction is not appropriate." (quoting *United States v. Hoffecker*, 530 F.3d 137, 176 (3d Cir. 2008)). And, while the government insisted that its proposed language came directly from caselaw, this Court has cautioned against doing that because, "[a]ppellate decisions are not always phrased well to explain complex concepts to juries. … To avert confusion and litigation, [this Court] suggest[s] that trial courts draw on better alternatives." *United States v. Greenspan*, 923 F.3d 138, 148 (3d Cir. 2019). Even "technically correct" language taken from caselaw can risk "confusing a jury." *Id.*

The language here was both incorrect and confusing. The instruction could have allowed, or even encouraged, the jury to convict on a conflict-of-interest theory, rather than bribery, because it minimized the importance of the *quid pro quo* and the parties' specific intent. *Cf.*

*United States v. Aunspaugh*, 792 F.3d 1302, 1307-10 (11th Cir. 2015) (vacating conviction where honest services fraud instruction could have allowed conviction on self-dealing instead of kickbacks theory). The intent that the payment specifically induce the action is what separates bribery from mere conflict of interest—i.e., a public official receiving "payments while taking discretionary action that benefits that payor[.]" *See Panarella*, 277 F.3d at 697. The lengthy, and argumentative instruction given here is simply not what was endorsed in *Bryant*.[22]

Moreover, the instruction is irreconcilable with the government's burden to prove "the payor provided a benefit to a public official intending that he will thereby take favorable official acts that he would not otherwise take." *Wright*, 665 F.3d at 568. The district court said the opposite when it told the jury that it could convict "even if ultimately the official ends up taking the same action that he likely would have taken" without the payment. *See* Appx4535. This is a far cry from what this Court endorsed in *Bryant*—that a bribe is still a bribe if it is given in part

---

[22] The court may have been implicitly relying on *dicta* from elsewhere in *Bryant*, indicating that a bribe or salary need not be the "sole impetus" for the public official's actions. *See* Appx4187 (citing *Bryant*, 655 F.3d at 242). But that language was focused on the intent only of the public official, not the payor.

for legitimate work. *See* 655 F.3d at 246. The equivalent in this case would be that Henon's salary could still have been a bribe if (as was the case) he continued to do some Local 98 work, so long as it was also paid for official action. But the instruction here allowed for something totally different—it directed the jury to convict on a theory that Henon could have been bribed even if every official act he took was one he would have taken anyway—the opposite of this Court's holding in *Wright*.[23]

### C. The district court's "official act" instruction relieved the government of its burden to prove an element.

The district court also altered the Third Circuit's Model instruction on Henon's "official acts," ultimately failed to include every element, and effectively directed the jury to find that the government had properly identified "questions or matters" under *McDonnell*. *See* Appx4537-38.

The "official act" element of honest services fraud has two parts: (1) the government must identify a specific and focused "question or matter" that could be brought before the public official, and (2) the government must prove the official made a decision or took an action on

---

[23] As discussed elsewhere, the government disputes this reading of *Wright*. *See supra* Section II.E.4. But it is not dispositive here, where the instruction was erroneous and confusing for other independent reasons.

that question or matter or agreed to do so. *See supra* Section II.E (citing *McDonnell*, 579 U.S. at 567). These are jury questions. The jury must decide whether the alleged actions took place and whether they satisfy the definitions of both a "question or matter" and official action. *United States v. Lindberg*, 39 F.4th 151, 161 (4th Cir. 2022) (citing *McDonnell*, 579 U.S. at 573-73, 577-80)).

The Third Circuit's Model instruction tracks these requirements. It defines "questions or matters," and then includes: "In this case, (*the indictment*) (*the government*) alleges the following questions, matters, causes, suits, proceedings, or controversies: (*list alleged questions, matters, causes, suits, proceedings or controversies*)." Mod. Crim. Jury Instr. 3rd Cir. 6.18.201B1-2 (2024). Dougherty's proposed instruction on this largely followed the Model instruction, with modifications to reflect *McDonnell. See* Appx635-36. The government also modified the Model instruction after defining "questions or matters" to say:

> For example, in Counts 98 through 109, the government alleges that the following are official matters: 1) L&I inspections, and in some instances shut downs, of operations or construction work; 2) legislation, resolutions or other city Council legislative activities; and 3) negotiation of a franchise contract between Comcast and the City of Philadelphia.

Appx720. The government also included a list of its proposed "decisions

or actions," despite the Model instruction not directing parties to do so. *See* Appx720-21.

Dougherty objected to the proposed instruction. Appx4198-4201. He pointed out that the proposed "questions or matters" were not specific or focused enough under *McDonnell*. Appx4198-99. He also explained that the instruction was "sort of putting an answer in front of the jury when it should be kind of a question." Appx4201. The district court also expressed concerns that the instruction "goes on a little too long," and that "it's for the jury to decide what an official act is." Appx4197.

The district court's eventual instruction included, in relevant part:

> In order for you to find the defendants guilty of any of these offenses, you must identify one or more specific and focused, again, questions, matters, causes, suits, proceedings or controversies that involve the formal exercise of governmental power.
>
> In this case, the government alleges that the following topics were specific and focused questions, matters, causes, suits, proceedings, or controversies and were acted upon:
>
> > One, the license and inspection bureau topics.
> >
> > Two, the Comcast Franchise Agreement topics.
> >
> > Three, the Philadelphia soda tax topics.
> > …
> > Five, the plumbing code / building trades topic.
> >
> > And six, the towing topic.

101

> In order to find the defendants guilty, you must find, as one of the elements of the alleged crimes, that defendant Henon committed or agreed to commit an official act in relation to one or more of those particular topics charged.

Appx4537-38.

The court's instruction did not correct the issues identified by the defense and, in fact, exacerbated them. Rather than narrowing the alleged "questions or matters," to comply with *McDonnell*, the court broadened them. As a result, several were not "specific and focused" or "relatively circumscribed," *see McDonnell*, 579 U.S. at 570, but were instead impermissibly "described at a high level of generality," *see Fattah*, 914 F.3d at 153. For example, Dougherty had proposed, the "enforcement of L&I Codes at CHOP by non-union contractors," Appx636, while the court's instruction simply said the "License and Inspection Bureau topics." Appx4537. These alleged "questions or matters" should not have even been posed to the jury at all. *Cf. Lindberg*, 39 F.4th at 161 (recognizing that *McDonnell* "explained that some conduct cannot constitutionally constitute an 'official act'").[24]

---

[24] This issue is also important because, pursuant to *Silver*, the "question or matter" had to be identified and contemplated at the time the bribe was accepted. *See supra* Section III.A.

Worse, the court deviated from the Model instruction, and, in effect, directed the jury on this element, rather than asking the jury to decide it. *See* Appx 4201 (defense objection). The Model instruction proposes laying out the definition of "questions or matters," then listing the alleged "questions or matters," one of which the jury must identify as such, and then instructing, "In order to find the defendant guilty of this offense, you must *also* find that [Henon] made a decision, took an action, or agreed to make a decision or take an action on one or more of the identified questions …" *See* Mod. Crim. Jury Instr. 3rd Cir. 6.18.201B1-2 (2024) (emphasis added); *see also* Appx635-36 (Dougherty's proposed instruction modeling this language). That makes clear that the jury must find *both* the "question or matter," *and* the official action—and not just that they occurred, but that they satisfied those definitions. The district court here omitted the word "also," instructing instead that, "In order to find the defendants guilty, you must find, as one of the elements of the alleged crimes, that Defendant Henon committed or agreed to commit an official act in relation to one or more of those particular topics charged." Appx4538. Taken together, that told the jury it needed only to find the public official committed an action, but not *also* find that one of the

103

proposed "questions or matters" was in fact a "question or matter." Stated another way, it suggested that the jurors should simply pick one of the government's proposed "questions or matters," and decide whether official action was taken with respect to it.

Though a subtle distinction, this did materially alter the Model instruction. "In general, use of this Circuit's Model jury instructions is favored." *United States v. Wiltshire*, 568 F. App'x 135, 140 (3d Cir. 2014) (unpublished) (citing *United States v. Peterson*, 622 F.3d 196, 208 (3d Cir. 2010)). Here, the deviation from the Model instruction relieved the government of its obligation to prove the "question or matter" element. It is "up to the jury … to determine whether the public official agreed to perform an 'official act,'" and the jury instructions must "adequately explain to the jury how to identify the question [or] matter," and that it must be "specific and focused[.]" *Lindberg*, 39 F.4th at 161 (citing *McDonnell*, 579 U.S. at 572-73, 577-79). Defendants have the "right to have the jury, rather than the judge, reach the requisite finding of 'guilty,'" so a judge "may not direct a verdict for the State no matter how overwhelming the evidence." *Sullivan v. Louisiana*, 508 U.S. 275, 277 (1993). By effectively excluding this element, the district court erred,

which merits vacating Dougherty's conviction. *See United States v. Haywood*, 363 F.3d 200, 206-07 (3d Cir. 2004) (jury instruction that excluded element required vacating conviction).

At the very least, the change "was capable of confusing and thereby misleading the jury," which likewise requires reversal. *See United States v. Zehrbach*, 47 F.3d 1252, 1264 (3d Cir. 1995) (en banc) (quoting *Bennis v. Gable*, 823 F.2d 723, 727 (3d Cir. 1987)). Whether the prosecution is "relieved of that burden via an instruction that omits an element of an offense, materially misdescribes that element, or shifts to the defendant the burden of proof on that element, the result is the same—the defendant has been denied his federal constitutional rights." *Smith v. Horn*, 120 F.3d 400, 416 (3d Cir. 1997).

## IV. The district court should have granted Dougherty's motion to dismiss based on his counsel's conflict of interest in the honest services fraud case.

**Standard of Review:** In Sixth Amendment challenges to attorney conflicts-of-interest, plenary review applies to the district court's application of legal precepts; factual findings are reviewed for clear error. *United States v. Morelli*, 169 F.3d 798, 810 (3d Cir. 1999) (citing *United States v. Brink*, 39 F.3d 419, 421 (3d Cir. 1994)).

The district court also should have granted Dougherty's motion to dismiss based on an attorney conflict during his honest services fraud

case. S.Appx110-31. Attorney 1 worked for the Firm, which also represented Comcast, an important actor in the honest services scheme alleged by the government. This created an actual conflict, which adversely affected Attorney 1's representation of Dougherty, including by causing Attorney 1 to refrain from calling a key Comcast witness and failing to elicit important testimony from another. This Court should vacate Dougherty's convictions on all the honest services fraud counts and remand for a new trial with conflict-free counsel.

## A. Defendants have a constitutional right to conflict-free counsel.

The Sixth Amendment guarantees not only the right to counsel, but the right to "representation that is free from conflicts of interest." *Wood v. Georgia*, 450 U.S. 261, 271 (1981). To show a constitutional violation, a defendant must demonstrate that "an actual conflict of interest adversely affected his lawyer's performance." *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980). An actual conflict exists "if, during the course of the representation, the interests of the two clients diverge with respect to a material factual or legal issue or to a course of action." *United States v. Gambino*, 864 F.2d 1064, 1070 (3d Cir. 1988). The conflict need not arise from representation of parties who are formally adverse in the same

proceeding. It arises whenever an attorney's personal or professional interests cause his judgment to diverge from his client's on a material question. *Gov't of V.I. v. Zepp*, 748 F.2d 125, 135 (3d Cir. 1984).

Adverse effect on a lawyer's performance requires two showings: first, that "some plausible alternative defense strategy or tactic might have been pursued," with "sufficient substance to be a viable alternative"; and second, that "the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests." *Gambino*, 864 F.2d at 1070. Once both elements are satisfied, "the defendant is entitled to a reversal for inadequate assistance of counsel without demonstrating prejudice." *United States v. Morelli*, 169 F.3d 798, 810 (3d Cir. 1999).

### B. The Firm's representation of Comcast was a conflict that violated Dougherty's Sixth Amendment rights.

#### 1. Attorney 1 and his Firm had an actual conflict in this case.

Attorney 1, a partner and head of the Firm's White Collar Defense group, had represented Dougherty since approximately 2006 in connection with an earlier federal investigation that did not result in charges. Appx108, 8862. The Firm was simultaneously serving as outside

counsel to Comcast, a long-standing and financially significant client. Appx8861-62; S.Appx188 ("Comcast is arguably the largest client of the firm."). As a firm partner, Attorney 1 received an annual distribution of firm profits that included revenues generated by the firm's Comcast work. Appx8864.

Comcast was also an interested party in Dougherty's underlying case as witness to (if not an alleged victim of) one of the honest services fraud charges. As discussed above, in late 2015, the city of Philadelphia was re-negotiating a cable franchise agreement with Comcast. According to the government, Henon allowed Dougherty to join a meeting with Comcast negotiators—Kathleen Sullivan and Mark Reilly—where he tried to arrange for a pro-union side-agreement from Comcast. The Firm specifically represented Comcast in the course of those negotiations and drafted the proposed side agreement with Dougherty on Comcast's behalf. S.Appx113, 187-90.[25]

---

[25] Notably, Attorney 1 cross-examined Comcast's Mr. Reilly about this exact issue. *See* Appx3081 (reading a Comcast e-mail stating "Ultimately, he feels better doing a separate letter than in the franchise. He is having [the Firm] draft for us today."). Professor Abbe Smith authored a letter for the defense, and identified this specifically as evidence of the conflict. S.Appx257.

This was an obvious conflict, because the interests of Dougherty and Comcast were at odds in this case. *See Gambino*, 864 F.2d at 1070. Attorney 1's compensation was tied to the Firm's Comcast work, Appx8864, and he recognized the conflict by trying to put up an ethical wall, Appx8865-66, seeking the firm's permission before interviewing Comcast witnesses, Appx8872-75, and making a deliberate decision to structure the defense so as not to treat Comcast witnesses as "hostile." Appx8871-72; *see also Morelli*, 169 F.3d at 810 (actual conflicts are "more likely to be found where 'an attorney takes positive steps on behalf of one client prejudicial to another' as opposed to cases where 'the attorney's actions are based on inaction and are passive'"). Attorney 1's divided loyalty was clear: his Firm concurrently represented the defendant and the source of the government's witnesses, creating in Attorney 1 precisely the competing obligations that this Court has identified as incompatible with undivided loyalty to the defendant. *Cf. United States v. Moscony*, 927 F.2d 742, 750 (3d Cir. 1991) ("Conflicts of interest arise whenever an attorney's loyalties are divided, … and an attorney who cross-examines former clients inherently encounters divided loyalties …" (citations omitted)).

It does not matter that there was "no concurrent representation as to this criminal case." *See* Appx115-16. This Court has specifically rejected the argument that the absence of formal adversity in the same proceeding defeats a conflict claim. *See United States v. Stewart*, 185 F.3d 112, 120-22 (3d Cir. 1999) (affirming disqualification of a law firm that represented a criminal defendant while simultaneously representing, in a parallel civil RICO action, four individuals who had agreed to testify against him at the criminal trial). And this Court has previously recognized that conflicts arise in this posture, where an attorney's financial or institutional stake in one client's satisfaction compromises his judgment for another. *See Moscony*, 927 F.2d at 750; *Zepp*, 748 F.2d at 135.

The district court below also erroneously credited the use of an ethics wall as effectively eliminating the conflict. Appx116. Attorney 1 recognized that Comcast's involvement created a potential problem and decided "almost immediately" to erect an ethics wall separating attorneys working on Dougherty's defense from those working on Comcast matters. Appx109, 8865-66. The wall was formally implemented on December 19, 2016. Appx109, 8830. Comcast did not retain the Firm to represent it in

connection with the Dougherty investigation and the Firm's attorneys who represented Comcast on other matters did not work on matters related to the Dougherty prosecution. Appx109, 115. The Firm had no objection to Attorney 1 representing Dougherty in this case. Appx8873-74, 8931.[26] But, no written conflict analysis was prepared and no formal waiver was obtained from Dougherty. S.Appx53-54.

The ethics wall did not cure the conflict, and in fact only crystalized the existence of a conflict. The wall did not contemplate whether Attorney 1's financial interest in one client's well-being affected his strategic judgment for the other. Moreover, a "screening mechanism cannot cure a prohibited representation under Model Rule 1.7." *United States v. Bellille*, 962 F.3d 731, 740 (3d Cir. 2020). The fact of a wall actually proves the opposite—either the relationship giving rise to the screen is not genuine and there was no basis for imposing one, or the relationship was real and a screen alone cannot cure the conflict. *Id.* at 742-43. Here, the wall protected *Comcast*'s information from Dougherty's defense team,

---

[26] Attorney 1 testified that he informed Dougherty of this meeting and that Dougherty confirmed he wanted Attorney 1 to remain as his counsel. Appx8873-75. Dougherty denied being told about the post-indictment meeting with Firm leadership. Appx9013.

but did nothing to insulate *Dougherty* from the consequences of Attorney 1's Comcast-conscious defense strategy, as discussed below. In resolving that intractable conflict in favor of one client and against the other, the wall did precisely what the conflict doctrine is designed to prevent.

### 2. The conflict adversely affected Attorney 1's performance.

The conflict also adversely affected Attorney 1's performance, because he failed to pursue plausible defense strategies that were in conflict with the Firm's loyalty to Comcast. *See Gambino*, 864 F.2d at 1070.

Throughout his representation, Attorney 1 conducted the defense in a way that would not require him to treat Comcast or its employees as adversaries. *See* Appx8871-72. For example, Attorney 1 declined to call David L. Cohen—a senior executive at Comcast involved in the franchise negotiations—as a witness at trial and never interviewed him. Appx9004-05. Dougherty repeatedly asked Attorney 1 to call Cohen as a defense witness or at minimum to interview him. Appx9004-05. Cohen and Dougherty had a long-standing relationship that included cooperation in resolving earlier labor disputes, including a prior franchise agreement negotiation, Appx8884, 8986-87, and they communicated

regularly during the period of the franchise negotiations, Appx8885, 8901, 8903-06, Appx9037. Dougherty believed that Cohen would testify that Dougherty's involvement in the franchise negotiations was not criminal – that it was "nothing more than doing business" – and that Cohen's account of their long working relationship would reframe the entire government narrative. Appx8975, 9004.

The Comcast relationship was, at a minimum, a contributing factor in the decision not to call Cohen. Attorney 1 acknowledged: structuring the defense to avoid hostile treatment of Comcast witnesses, Appx8871-72, requiring firm approval before approaching Comcast witnesses for interviews, Appx8872-75, and never interviewing Cohen despite Dougherty's persistent requests throughout trial preparation, Appx9004-05. His stated reason for not calling Cohen—that he lacked an FBI 302 documenting any government interview—is illogical: a defense attorney's obligation to investigate witnesses is not conditioned on the government having done so first, and an attorney who would only call witnesses already vetted by the prosecution has effectively ceded his client's case to the other side. Appx8875-76, 9036.

Calling Cohen would have put a sitting senior Comcast executive

113

on the witness stand to testify about his behind-the-scenes role in encouraging Dougherty's participation in the franchise negotiations—participation that, from the government's perspective, was central to the honest services charges. Exposure of that relationship carried concrete risks for Comcast: the integrity of a fifteen-year franchise agreement could be called into question; Cohen's role as a participant rather than a passive victim of Dougherty's conduct could create regulatory and reputational problems; and franchise agreements in other jurisdictions could be affected. Appx8903-05, 8962-63, 9034-35. Attorney 1, as a partner of Comcast's outside counsel, had professional obligations bearing on that exposure that a conflict-free attorney would not have had. Putting Cohen "on the stand to testify" would have been "'inherently in conflict with … the attorney's other loyalties and interests' …" *See United States v. Schwarz*, 283 F.3d 76, 95 (2d Cir. 2002) (citation omitted) (vacating conviction for attorney conflict).

Attorney 1 also took a noticeably conservative approach at trial when cross examining Kathleen Sullivan, a Comcast employee and key government witness who attended the December 2 meeting. The government examined her at length. Appx2693-2761. Attorney 1's cross-

examination spanned approximately three pages of transcript. Appx2761-63. He elicited testimony that the meeting was "cordial" and that Dougherty's statement about wanting "jobs for his guys" was not delivered as a threat. Appx2763. But Attorney 1 failed to elicit that Sullivan had invited Dougherty to the December 2 meeting, a fact that would have directly rebutted the government's theory that Henon and Dougherty were the driving forces behind the encounter. Appx8962-63. Attorney 1 offered no explanation for why he did not pursue that line of questioning. Appx8961-63. The "failure to call witnesses beneficial to client A but detrimental to client B, coupled with the failure to cross-examine client B, is the very definition of a conflict of interest, and a violation of the Sixth Amendment." *Boykin v. Webb*, 541 F.3d 638, 646 (6th Cir. 2008).

Finally, Dougherty expressed in a wiretapped recording that "Comcast is putting a tremendous amount of pressure on [his] lawyer" because of the firm's representation of Comcast. Appx8879, 9041. Dougherty made this statement in a conversation he believed was private, before any conflict motion had been filed or contemplated. Attorney 1 denied that anyone ever pressured him and testified that had

115

he experienced any such pressure, he would have left the firm rather than drop Dougherty as a client. Appx8880.

As the Second Circuit has explained:

> The test is a strict one because a defendant has a right to an attorney who can make strategic and tactical choices *free from any conflict of interest*. An attorney who is prevented from pursuing a strategy or tactic because of the canons of ethics is hardly an objective judge of whether that strategy or tactic is sound trial practice.

*Schwarz*, 283 F.3d at 92. The defendant "does not need to prove that the forgone strategy was reasonable or that it would have affected the outcome of the trial, only that it was a plausible one and that it was forgone." *Id.* at 93. Here, Dougherty need not show his proposed strategies to call Cohen or further cross-examine Sullivan would have succeeded—only that they were plausible. Here, they were, and Attorney 1's decision to forego them demonstrates an actual conflict that adversely affected his performance. *See Cuyler*, 446 U.S. at 348.

This Court should, therefore, vacate the honest services fraud convictions and remand for a new trial on those counts.

**V. The district court should have granted Dougherty's motion to dismiss under the Sixth Amendment based on the government's improper use of a confidential informant.**

**Standard of Review:** "When determining whether a suspect's Sixth Amendment right to counsel has been violated, [this Court's] standard of review is plenary." *United States v. Tyler*, 164 F.3d 150, 156 (3d Cir. 1998). When a constitutional claim is decided on a "developed factual record" the district court's factual findings are reviewed for clear error. *United States v. Voigt*, 89 F.3d 1050, 1064 (3d Cir. 1996).

The district court also should have granted Dougherty's motion to dismiss based on the government's improper use of a confidential informant in violation of his Sixth Amendment rights. S.Appx60-109. The government surreptitiously employed a confidential informant ("CI") to illegally record Dougherty for years after he had been indicted and was represented by counsel in this case. That action contravened Dougherty's Sixth Amendment right to counsel, by, *inter alia*, disclosing possible defense strategies. This Court should, therefore, vacate Dougherty's convictions on all the honest services fraud and embezzlement counts.

**A. The Sixth Amendment protects against secret interrogations and other efforts to circumvent a defendant's right to counsel.**

The Sixth Amendment provides that, in "all criminal prosecutions, the accused shall enjoy the right … to have the Assistance of Counsel for

his defence." U.S. Const. amend. VI. During "perhaps the most critical period of the proceedings, that is to say, from the time of their arraignment until the beginning of their trial, when consultation, thorough-going investigation and preparation (are) vitally important, the defendants (are) as much entitled to such aid (of counsel) during that period as at the trial itself.'" *Massiah v. United States*, 377 U.S. 201, 205 (1964) (quoting *Powell v. Alabama*, 287 U.S. 45, 57 (1932)). This "guarantee includes the State's affirmative obligation not to act in a manner that circumvents the protections accorded the accused by invoking this right." *Maine v. Moulton*, 474 U.S. 159, 176 (1985).

"'Any secret interrogation of the defendant, from and after the finding of the indictment, without the protection afforded by the presence of counsel, contravenes the basic dictates of fairness in the conduct of criminal causes and the fundamental rights of persons charged with crime.'" *Massiah*, 377 U.S. at 205. Likewise, the "Sixth Amendment is violated when the State obtains incriminating statements by knowingly circumventing the accused's right to have counsel present in a confrontation between the accused and a state agent." *Moulton*, 474 U.S. at 176.

Even where the government does not use any such elicited statements at trial, the Sixth Amendment is violated when the government:

> (1) intentionally plants an informer in the defense camp; (2) when confidential defense strategy information is disclosed to the prosecution by a government informer; or (3) when there is no intentional intrusion or disclosure of confidential defense strategy, but a disclosure by a government informer leads to prejudice to the defendant.

*United States v. Costanza*, 740 F.2d 251, 254 (3d Cir. 1984) (*Costanza II*) (citing *Weatherford v. Bursey*, 429 U.S. 545 (1977)). In such cases, dismissal, rather than suppression, is required. "The severity of the sanction imposed in these cases reflects [this Court's] view of the importance of protecting a criminal defendant's attorney-client relationship from a deliberate attempt to destroy it and subvert the defendant's right to effective assistance of counsel and a fair trial." *United States v. Costanza*, 625 F.2d 465, 469 (3d Cir. 1980) (*Costanza I*).

**B. The government's reliance on a CI to monitor Dougherty throughout his underlying case violated his Sixth Amendment rights.**

The district court should have granted Dougherty's motion to dismiss. By relying on a CI after Dougherty had been indicted, and throughout most of his underlying case, the government essentially

guaranteed that Dougherty's Sixth Amendment rights would be violated. *See United States v. Henry*, 447 U.S. 264, 274 (1980) ("intentionally creating a situation likely to induce [the defendant] to make incriminating statements without the assistance of counsel … violated [the defendant's] Sixth Amendment right"). And, not only did the government use its CI to learn of the conduct that ultimately led to the *extortion* case and its potential defense strategy, *see* S.Appx79, it planted an investigator in Dougherty's defense camp and learned confidential defense strategy about the trials *in this case*, *see* S.Appx79-85; *see also Costanza II*, 740 F.2d at 254.

Several of the CI's recordings include Dougherty unmistakably discussing the pending charges against him. Government agents appeared to be aware that the CI was learning of Dougherty's potential defense strategy. *See* S.Appx80 (noting agent e-mail stating "Discussion of the civil and criminal cases seems to be woven throughout the call, so much so that I cannot provide a useful cheat sheet of areas of potential concern"). One of the most obvious discussions of the pending charges occurred on October 17, 2020:

> I had two of you in the last two weeks tell me, you know, since the government, I don't even go there. No, you have to go

there. We are not throwing bricks through a window to get there. You don't care if a guy's wired. Ok. We're not breaking any laws. We don't break any laws. … Because my normal (UI) is, my normal thing is, hey what do you need, how do we help you, how many people can I put to work.

…

Cause we're gonna prove it was a rogue U.S. Attorney who was weaponizing people to protect his pension at Comcast, his family's retirement.

…

He's not apologizing for this one, I'm telling you. You know, he's kinda pissed, as he should be. He wants to go to trial. You got the U.S. Attorney's wife is the lawyer at Comcast. That was our big fight. Ok. He's asking that question and people get nervous.

S.Appx82-83. On one September 30, 2021 call, Dougherty's statements provided insight into potential trial witnesses. S.Appx84. Likewise, a recording taken on November 23, 2021, includes Dougherty saying:

There's nothing that went on in this union, okay good bad or indifferent (UI). Okay? With taking way more credit to the bad and indifferent than I ever did for the good. Okay? So finish some of this, at no time did we see a problem. And every specialist that I could communicate with (UI).

…

You, that's not in the indictment, I am not worried about the future ones, some of the ones, oh you took from this, I'm telling you at the next one, I'll, the union will owe me money. When they realize all the pay I didn't take

…

Except the US Attorney who proceeded with that stuff was married to the top in-house counsel at Comcast.

S.Appx83-84.

Dougherty also noted below that many of the recordings specifically laid out his central defense strategy for the embezzlement trial. On the recordings, Dougherty discussed the growth of Local 98 under his leadership, the informal management and recordkeeping practices that failed to keep up, the extraordinary demands on his time, and uncompensated hours and expenses he accumulated. S.Appx80-84. That was the defense that Dougherty put on during the embezzlement trial. *See generally* Appx8527-66. In a recording from September 30, 2021, Dougherty specifically talked about that in the context of his charges. He stated:

> They came back about two years later went after the apprentice training but focused on me, because they, we were using the vendor who was giving money to other labor leaders directly for the use of the vending machines where our vending machines went to apprentice training … we didn't have food back then and we didn't have stores across the street back then, that was the only place we could go and get snacks at 11 o'clock on a Saturday night when we were working on trying to clean up the list. And I asked to put Doritos in the machine. So I'm guilty of adding Doritos to the machine.

S.Appx83.

The briefing and hearing on this CI issue preceded the embezzlement trial, making it difficult for the district court to appreciate

the relationship between the recordings and Dougherty's defense strategy. Moreover, the government carefully guarded access to both the CI recordings and the source reports of communications between the CI and the agents, making it difficult to learn the full extent of its encroachment into the defense camp. As this Court has explained:

> it is highly unlikely that a court can, in such a hearing, arrive at a certain conclusion as to how the government's knowledge of any part of the defense strategy might benefit the government in its further investigation of the case, in the subtle process of pretrial discussion with potential witnesses, in the selection of jurors, or in the dynamics of trial itself.

*United States v. Levy*, 577 F.2d 200, 208 (3d Cir. 1978). "The prosecution makes a host of discretionary and judgmental decisions in preparing its case. It would be virtually impossible for an appellant or a court to sort out how any particular piece of information in the possession of the prosecution was consciously or subconsciously factored into each of those decisions." *United States v. Danielson*, 325 F.3d 1054, 1071 (9th Cir. 2003), *as amended* (May 19, 2023). It was simply impossible to say that the government had not gained insight into Dougherty's defense strategy at the time of the court's opinion.

The district court rejected Dougherty's argument, noting that Dougherty's attorneys were not recorded and disagreeing that the

recordings infiltrated Dougherty's "defense camp," or disclosed defense strategy. Appx95-101. But it took too narrow a view of the Sixth Amendment violation. This Court does not require the defense to lay out exactly how the government's interference with a defendant's right to counsel might benefit it at trial. The focus is "on the proof of transmission of any information of even the slightest potential strategic value. … 'we think that the inquiry into prejudice must stop at the point where attorney-client confidences are actually disclosed to the government enforcement agencies responsible for investigating and prosecuting the case.'" *United States v. Mastroianni*, 749 F.2d 900, 907 (1st Cir. 1984) (quoting *Levy*, 577 F.2d at 209).

Because the government's CI provided it with insights into Dougherty's potential defense strategies, his Sixth Amendment rights were violated, *see Costanza II*, 740 F.2d at 254, and this Court should vacate his convictions on all counts.

### C. The government's use of a filter team did not cure its Sixth Amendment violations.

The government emphasized below that it relied on a filter team (and the CI's discretion) to restrict the trial team's access to privileged communications in the CI's recordings. *See* Appx4825-29. The

government's precautions, however, were insufficient.

A filter team "usually consists of colleagues of the government's prosecution team, such as agents and prosecutors," and it "independently reviews and identifies documents protected by the attorney-client privilege to prevent the disclosure of privileged information to the prosecution team." *State v. Robinson*, 209 A.3d 25, 31 (Del. 2019). The government's team on Dougherty's case established a filter team of agents and AUSAs from the same office to review the CI's recordings and redact privileged information and, further, gave instructions to the CI to not disclose privileged communications to them, but rather only to the filter team. *See* Appx88-90. It was suggested below, though never explicitly argued, that the use of the filter team mitigated or cured potential Sixth Amendment violations from the CI. *See* 4825-29.

This Court has never recognized that use of a "filter team" or "taint team" cures Sixth Amendment violations like the one here. This is a "common tool employed by the Government," to "review for privileged documents[.]" *In re Fattah*, 802 F.3d 516, 530 (3d Cir. 2015). But privilege review is a different question from the one here. This Court has not had "occasion to consider the appropriate limits, if any, on their use." *Id.* at

125

530 n.53. Moreover, "the use of government taint teams has often been questioned or outright rejected by [other] courts, at least in the context of criminal prosecutions." *Matter of the Search of the Scranton Hous. Auth.*, 436 F. Supp. 2d 714, 721–22 (M.D. Pa. 2006), *vacated sub nom. In re Search of Scranton Hous. Auth.*, 487 F. Supp. 2d 530 (M.D. Pa. 2007) (citations omitted). "[T]aint teams present inevitable, and reasonably foreseeable, risks to privilege, for they have been implicated in the past in leaks of confidential information to prosecutors. … It is thus logical to suppose that taint teams pose a serious risk to holders of privilege, and this supposition is substantiated by past experience." *In re Grand Jury Subpoenas*, 454 F.3d 511, 523 (6th Cir. 2006). As one court has explained,

> the government's affirmative decision to invoke these procedures constitutes a *per se* intentional intrusion. …Where the government chooses to take matters into its own hands rather than using the more traditional alternatives of submitting disputed documents under seal for *in camera* review by a neutral and detached magistrate or by court-appointed special masters … it bears the burden to rebut the presumption that tainted material was provided to the prosecution team.

*United States v. Neill*, 952 F. Supp. 834, 841 (D.D.C. 1997) (citations omitted).

The use of the filter team here raised all the concerns identified by

126

these courts. The government opted to police itself through a filter team from the exact same U.S. Attorney's office, rather than allow the court or a special master to review the most sensitive materials. *See* S.Appx91-93. If anything, the use of a filter team exacerbated Sixth Amendment concerns, because its usage is a "*per se* intentional intrusion," *Neill*, 952 F. Supp. at 841, and it was fair to presume that Dougherty's rights were endangered.

Even if the use of a filter team was not a *per se* concern, its use here was problematic. The government admitted that some recordings were given to the agents on the Dougherty case without going through the filter process, and they reviewed those recordings themselves. Appx93-94; S.Appx72. Moreover, the CI had repeated, direct interactions with an agent from Dougherty's case—ostensibly memorialized in source reports—without first going through the filter team. *See* S.Appx73. One of the members of the filter team participated in the execution of the search warrant in Dougherty's extortion case. *See* S.Appx91. And communications between members of the filter team about potentially privileged materials also, in some instances, included one of the trial team agents and other staff. *See* S.Appx91.

Additionally, neither the filter team, the agents in this case, nor the CI, appeared to have been properly admonished about the scope of the Sixth Amendment privilege. S.Appx87. The protocol materials never mentioned the Sixth Amendment at all, nor enumerated what types of information would fall within the Sixth Amendment's protections. S.Appx87. Instead, they were simply warned to look out for communications between Dougherty and counsel that could be privileged. S.Appx87-88. But the "Sixth Amendment attorney-client confidentiality is distinct from and broader than the attorney-client privilege." *United States v. Hohn*, 123 F.4th 1084, 1094 (10th Cir. 2024). And, even if the Sixth Amendment only protected attorney-client privilege or work product, the primary agent acknowledged she would have no way of knowing if Dougherty's statements on the recordings had been informed by discussions with counsel. S.Appx88.

An agent from the filter team seemed to take a liberal approach, indicating that talking to lawyers or about legal advice would only "arguably be potentially privileged, even though, again, I would argue that they are not given the open forum that he was speaking in." S.Appx88. The same agent went further, admitting that because there

were non-lawyers on the recordings with Dougherty, "I did not believe this was even potentially privileged, whether it was talking about what he might want to say at a trial, or some other thing. I do not consider this to be potentially privileged." S.Appx89. This was a non-attorney, making erroneous decisions about what the filter team should redact, without any understanding of the scope of the Sixth Amendment protection in this context. *See In re Fattah*, 802 F.3d at 530 ("Because of the legal nature of the privilege issues involved, we agree that the first level of privilege review should be conducted by an independent DOJ attorney acceptable to the District Court."). Here, agents, who clearly misunderstood the law, completed the first filter review, and filter AUSAs did not review any recordings unless an agent believed they had privileged material. S.Appx90.

The government's deeply flawed use of a filter team in this case did not mitigate any of the violations of Dougherty's Sixth Amendment rights. The protocol was, at best, insufficient to protect Dougherty's rights and, at worst, illustrative of a deliberate attempt to gain a strategic trial advantage. This Court should, therefore, vacate Dougherty's convictions on all counts.

## VI. The district court's embezzlement jury instructions misstated the law and understated the requisite *mens rea*.

**Standard of Review:** This Court reviews "*de novo* 'whether the jury instructions stated the proper legal standard.'" *Steiner*, 847 F.3d at 114 (citation omitted). The "refusal to give a particular instruction" and the "wording of instructions" are reviewed for abuse of discretion. *Id.*

The district court also erred in the embezzlement trial by giving jury instructions that individually and collectively misstated the government's burden as to the required *mens rea*. The court: (1) abused its discretion by giving a willful blindness instruction without adequate justification from the government, and (2) misstated the law when it altered this Court's Model "good faith defense" instruction at the government's urging. These errors merit vacating Dougherty's convictions on the embezzlement and related counts, including all counts from the second trial because they necessarily relied on the embezzlement convictions.

### A. Conviction for embezzlement from a labor organization requires proof that the defendant acted "knowingly, willfully, unlawfully, and with fraudulent intent."

The crux of the government's allegations in the second trial was that Dougherty and Burrows conspired to embezzle money from Local 98, in violation of 18 U.S.C. § 371 and 29 U.S.C. § 501(c).

Section 501 lays out the fiduciary responsibilities of officers of labor

organizations, and provides that: "any person who embezzles, steals, or unlawfully and willfully abstracts or converts to his own use … any of the moneys, fund, securities, property, or other asserts of a labor organization of which he is an officer" faces criminal liability. 29 U.S.C. § 501(c). Embezzlement is a conversion (or unauthorized appropriation) of property belonging to another, while the property is lawfully in the defendant's possession, taken with the knowledge that the appropriation is not authorized. *United States v. Stockton*, 788 F.2d 210, 216-17 (4th Cir. 1986); *see also United States v. Schneider*, 14 F.3d 876, 880 (3d Cir. 1994).

"A union employee commits a taking in violation of section 501(c) when 'he unlawfully and willfully' uses union funds in a manner that works to the personal benefit of himself or the payee and does not benefit the union, whether or not the union went through the form of authorization.'" *United States v. Clark*, 489 F. App'x 558, 560 (3d Cir. 2012) (unpublished) (quoting *United States v. Lore*, 430 F.3d 190, 201 (3d Cir. 2005)). To violate § 501(c), the defendant must act "knowingly, willfully, unlawfully, and with fraudulent intent to deprive the [labor organization] of its money, funds, securities, property or other assets."

*United States v. Oliva*, 46 F.3d 320, 324 (3d Cir. 1995).

**B. The district court's "willful blindness" instruction for embezzlement was erroneous.**

The district court erred when it gave a modified Third Circuit Model jury instruction on "willful blindness" on the substantive embezzlement counts (Counts 2 through 41). *See* Appx8675-78. The government did not articulate any evidentiary basis to justify the disfavored instruction. The court instructed, at the government's request, that:

> there has been a question raised whether the defendants were conscious and aware of the nature of their actions and some of the alleged conspirators, and of the surrounding facts and circumstances pertaining to this offense.
>
> When as in this case, knowledge of a particular fact or circumstance is an essential part of an offense charged, the government may prove the defendant knew of the nature of the actions of some of the alleged co-conspirators, if the evidence proves beyond a reasonable doubt that the defendants deliberately closed their eyes to what would otherwise have been obvious to them.

Appx8676. The instruction did not apply to any specific element of embezzlement, was never explained by the government, and alleviated the government's burden to prove the *mens rea* of the offense.

"The knowledge element of a crime … may be satisfied upon a showing beyond a reasonable doubt that a defendant had actual knowledge or 'deliberately closed his eyes to what otherwise would have

been obvious to him concerning the fact in question.'" *United States v. Brodie*, 403 F.3d 123, 148 (3d Cir. 2005) (quoting *Stewart*, 185 F.3d at 126). "Willful blindness 'is deemed to satisfy a scienter requirement of knowledge' where 'the defendant himself was subjectively aware of the high probability of the fact in question." *United States v. Sherman*, 126 F.4th 224, 232 (3d Cir. 2025) (citation omitted). "Willful blindness, however, 'is not to be equated with negligence or lack of due care … [Rather,] the defendant himself [must have been] subjectively aware of the high probability of the fact in question, and not merely that a reasonable man would have been aware of the probability.'" *United States v. Caraballo-Rodriguez*, 726 F.3d 418, 420 n.2 (3d Cir. 2013).

The willful blindness instruction "is not a routine instruction for cases in which knowledge is at issue." *United States v. Mapelli*, 971 F.2d 284, 286 (9th Cir. 1992) (citation omitted). "[M]any of the courts of appeals admonish that 'caution is necessary in giving a willful blindness instruction.'" *United States v. Alston-Graves*, 435 F.3d 331, 340-41 (D.C. Cir. 2006) (quoting *United States v. Cassiere*, 4 F.3d 1006, 1023 (1st Cir. 1993)). "Some say that such an instruction is 'rarely appropriate,' or only proper in 'rare circumstances' or 'rare cases.' Others are 'wary of giving a

willful blindness instruction,' or advise that the instruction be given only 'sparingly.'" *Id.* at 341 (citations omitted) (listing cases from Fourth, Fifth, Ninth, Tenth, and Eleventh Circuits); *see also United States v. Lee*, 966 F.3d 310, 324 (5th Cir. 2020). "Actual knowledge, of course, is inconsistent with willful blindness. The deliberate ignorance instruction only comes into play, therefore, if the jury rejects the government's case as to actual knowledge." *United States v. Heredia*, 483 F.3d 913, 922 (9th Cir. 2007) (en banc) (cited by Mod. Crim. Jury Instr. 3rd Cir. 5.06, Comment (2024)). Still, if the instruction "is supported by sufficient evidence, it is not inconsistent for a court to charge a jury on both an actual knowledge theory and a willful blindness theory." *Stewart*, 185 F.3d at 126.

Despite the government claiming it could not "think of another case in which willful blindness applies more than this one," Appx8306, it offered no explanation of its "factual predicate for the instruction," and no possible explanation could have "remotely justified giving a willful blindness instruction in this case[.]" *See Alston-Graves*, 435 F.3d at 341. The government put on no evidence showing the defendants deliberately avoided learning any facts. So there simply was no evidentiary basis to

justify the requested willful blindness instruction. Instead, the government argued that because knowledge was an element, and the defendants might argue they did not know what the other was doing, it should get the instruction. *See* Appx8306-10.

In addition to lacking a proper factual basis, the instruction was legally defective because it was not given with respect to an actual element of embezzlement. The court instructed on "willful blindness" as to a non-existent element—awareness of the actions of coconspirators and surrounding facts. Appx8295, 8676; *see also* Appx8311 (defense counsel noting that is not an element of embezzlement). The government tellingly responded to objections: "knowledge does not necessarily have to be one element to go to knowledge because, again, they are going to argue this." Appx8312. Indeed, the court deviated meaningfully from the Model Instructions to make this fit. The Model proposes: "To find (*name*) guilty … you must find that the government proved beyond a reasonable doubt that (*name*) knew (*state the fact or circumstance, knowledge of which is required for the offense charged*)." Mod. Crim. Jury Instr. 3rd Cir. 5.06 (2024). The court pivoted, instructing "you must find that the government proved beyond a reasonable doubt that *the defendant acted*

135

*knowingly. In this case, there has been a question raised ...*" Appx8676 (emphasis added). This divergence highlights the flawed nature of the instruction. It did not comport with the Model Instruction because it failed to identify the specific fact or circumstance for which knowledge was an element of embezzlement.

For a defendant to be found guilty of embezzlement, the government has a considerable *mens rea* burden, to prove action committed "knowingly, willfully, unlawfully, and with fraudulent intent[.]" *See Oliva*, 46 F.3d at 324. But the structure of the court's instructions and reliance on willful blindness minimized that burden as much as possible. By giving this rarely appropriate instruction, without adequate justification by the government or explanation as to the element it applied to, the district court, at best, confused the elements of this offense and, at worst, changed the government's burden of proof. In either event, the error merits reversal. *See Horn*, 120 F.3d at 416; *Zehrbach*, 47 F.3d at 1264.

**C. The district court's modifications to the Model Instruction on the "good faith" defense misstated the law.**

The district court also erred by modifying this Court's Model

Instruction on the good faith defense. Appx8685-86.

Dougherty requested that the court give the Third Circuit's Model Instruction on good faith for the embezzlement counts. Appx8278-79. The Model Instruction says: "If you find that (*name*) acted in 'good faith,' that would be a complete defense to this charge, because good faith on the part of (*name*) would be inconsistent with (*his*) (*her*) acting (*describe the required mental state*)." Mod. Crim. Jury Instr. 3rd Cir. 5.07 (2024).

The government argued that good faith is not a complete defense in the Third Circuit but only a part of the totality of the circumstances in assessing fraudulent intent, citing to *United States v. Oliva*, 46 F.3d 320. Appx8360-62, 8399-8402. The government successfully convinced the court to modify the Model Instruction, by removing reference to a "complete defense," and, instead, instructing only that the jury "may consider that in determining whether the defendants act knowingly, willfully, unlawfully and with fraudulent intent." Appx8685. Likewise, the district court modified the last sentence of the Model Instruction, which directs:

> If you find from the evidence that (*name*) acted in good faith, as I have defined it, or if you find for any other reason that the government has not proved beyond a reasonable doubt that (*name*) acted (*describe the required mental state*), you

must find (*name*) not guilty of the offense of (*state the offense*). Mod. Crim. Jury Instr. 3rd Cir. 5.07 (2024). The district court removed the language about good faith from this sentence, so that the jury was not instructed that it must find the defendants not guilty if they acted in good faith. Appx8686.

That is simply not the law. Good faith is a complete defense in the Third Circuit. The Model instruction the government insisted on modifying was itself from the Third Circuit. As the Model Instructions note, "'Good faith' is a defense whenever the defendant's good faith is inconsistent with a finding that the defendant acted with a mental state required by the definition of the offense charged." Mod. Crim. Jury Instr. 3rd Cir. 5.07, Comment (2024). A "jury finding of good faith is inconsistent with a finding that the defendant acts knowingly and willfully." *United States v. Gross*, 961 F.2d 1097, 1103 (3d Cir. 1992).[27] "[G]ood faith is a complete defense to charges of acting with fraudulent

---

[27] The Court found in *Gross* that it was not an abuse of discretion to decline to give a good faith instruction because the proper instructions on knowledge and willfulness ensured that a "finding of good faith would lead to an acquittal." 961 F.2d at 1103. That is unlike the situation here, where the court gave an incorrect statement of the good faith defense, thus permitting the jury to convict even if it found good faith.

intent because good faith is simply inconsistent with the intent to defraud." *Zehrbach*, 47 F.3d at 1259 (describing district court's charge). And, because a "willful" *mens rea* requires knowledge of a legal duty, a defendant is not guilty of a willful offense if he believed in "good faith" that his conduct was not unlawful. *United States v. Bunchuk*, 799 F. App'x 100, 103 (3d Cir. 2019) (unpublished) (citing *Cheek v. United States*, 498 U.S. 192, 202 (1991)); *see also Fattah*, 914 F.3d at 172 (citing district court instruction that "good faith is a complete defense to the charges," which included a *mens rea* of "knowingly, willfully, corruptly, or with intent to defraud or intent to impede, obstruct or wrongfully influence").

Good faith was a complete defense to the embezzlement charges here because it would have been clearly irreconcilable with acting "knowingly, willfully, unlawfully and with fraudulent intent[.]" *See Oliva*, 46 F.3d at 324. As one district court put it: "There can be no question that good faith constitutes a defense to alleged violations of Section[ ] 501(c) … since [the statute] require[s] proof of fraudulent intent by the Government." *United States v. Cottrell*, 1986 WL 11439, at*5 (E.D. Pa. Oct. 9, 1986); *cf. United States v. DeFries*, 129 F.3d 1293, 1308 (D.C.

Cir. 1997) (recognizing that another type of good faith defense—advice of counsel—is a complete defense to specific intent crimes like § 501(c)).

The government's reliance on *Oliva* below was misplaced. *See* Appx8360-62, 8399-8402. In *Oliva*, the issue this Court addressed was "whether a belief that one's acts were unauthorized and/or were not for the benefit of the union are merely factors bearing on intent or whether they are the essence of intent and must be proven at trial." 46 F.3d at 323. Though the phrase "good faith" appears at times in the *Oliva* opinion, the case is not about the "good faith" defense contemplated by the Model Instruction—it is about the specific "benefits and authorization defenses." *See id*. at 324. In that context, the Court found that a "good faith belief of benefit to the members of the union as a whole," should be part of the totality of the circumstances in determining intent. *Id*. This Court has consistently characterized the holding of *Oliva* as a rejection of "*union authorization and union benefit* as absolute defenses to a finding of fraudulent intent[.]" *United States v. Dressel*, 625 F. App'x 583, 587 (3d Cir. 2015) (unpublished) (emphasis added); *see also Lore*, 430 F.3d at 202 ("we held [in *Oliva*] that authorization and benefit are 'merely factors that may be considered as bearing on intent.'"). These

cases say nothing about good faith and, indeed, the *Oliva* case did not even address a good faith defense instruction. This Court assuredly did not purport to, *sub silentio*, create an exception to the long-recognized rule that "good faith" is a complete defense to charges of fraudulent intent and willfulness—a point the Court's own model instructions emphasize.

This Court favors use of its model jury instructions, *see Wiltshire*, 568 F. App'x at 140, and the district court's modifications to the good faith instruction relieved the government of its burden of proof and confused the elements of the offense, which merits reversal. *See Horn*, 120 F.3d at 416; *Zehrbach*, 47 F.3d at 1264.

# Conclusion

For the foregoing reasons, Appellant John Dougherty respectfully requests that his convictions be vacated, and the case be remanded for further proceedings below.

<div style="margin-left: 45%;">

Respectfully submitted,

K. ANTHONY THOMAS
Federal Public Defender

*s/ Timothy M. Shepherd*
*s/ Anita Aboagye-Agyeman*

Timothy M. Shepherd
Anita Aboagye-Agyeman
Assistant Federal Public Defenders
22 South Clinton Avenue
Station Plaza #4, Fourth Floor
Trenton, New Jersey 08609
(609) 690-0414

Attorneys for Appellant
John Dougherty

</div>

Dated:      May 15, 2026
            Trenton, New Jersey

## Certificate of Counsel, Compliance, and Service

Timothy M. Shepherd hereby certifies as follows:

1.     I am an Assistant Federal Public Defender, and I am admitted to practice before the United States Court of Appeals for the Third Circuit.

2.     I caused an electronic copy of the Brief and Appendix to be filed today, May 15, 2026. Seven copies of the Brief and four copies of the Appendix will also be hand-delivered today to the Clerk's Office.

3.     I also caused a copy of the Brief and Appendix to be served today, May 15, 2026, upon the United States by the Notice of Docketing Activity generated by the Third Circuit's electronic filing system upon:

> Robert A. Zauzmer, Esq.
> Assistant United States Attorney
> Office of the United States Attorney
> 615 Chestnut Street
> Suite 1250
> Philadelphia, PA 19106

4.     The text of the electronic brief is identical to that in the paper copies.

5.     The brief has been scanned with Trend Micro Apex One Antivirus and no virus was detected.

6.      The brief, which is more than thirty pages long, complies with this Court's May 11, 2026 order, DE #65, permitting counsel to exceed the word and type-volume limitations contained in Federal Rule of Appellate Procedure Rule 32(a)(7)(B)(i). The word count on the Word 360 word processing system used to prepare the brief states that the brief contains 28,130 words, which does not exceed the 29,000-word limit set by this Court.

The foregoing is true and correct to the best of my knowledge and information. I am aware that if any of the foregoing is willfully false, I am subject to sanctions.

Respectfully submitted,

s/ *Timothy M. Shepherd*

Timothy M. Shepherd
Assistant Federal Public Defender

Date: May 15, 2026
        Trenton, New Jersey